### GOSE et al. v. BROOKS. (No. 2332.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 24, 1921. Rehearing Denied March 17, 1921.)

1. **Chattel mortgages ☜139—Partnership ☜ 138 — Sales ☜234(8) — Partner has no apparent authority to dispose of firm property for own benefit; innocent purchaser or mortgagee from one procuring conditional title by fraud held to have no title.**

Where an impostor secured possession of mules by representing to their owner that he was J. R. J., the nephew and partner of a mule dealer of the same name, a resident of A., in another state, and gave for them $2,900 draft on such other J. R. J., who really existed, and the bank in A., on inquiry, telegraphed that "J. R. J.'s draft for $2,900 will be paid," there was no completed sale to the impostor, but at most a voidable sale to the real J. R. J., and, on the return of the draft as a forgery, an innocent purchaser or mortgagee of the mules from the impostor had no title as against the owners, as the payment by forged draft was not a payment, and the impostor had no authority, even apparent, to dispose of the mules, which were purchased as firm property, for his personal and private benefit.

2. **Chattel mortgages ☜139—Innocent mortgagee of mules held entitled to reimbursement for their feed and care.**

An innocent mortgagee of mules, to which mortgagor had no title, *held* entitled to be reimbursed by the owner, upon the latter's reclaiming them, for their feed and care while in mortgagee's possession.

Willson, C. J., dissenting.

On Motion for Rehearing.

3. **Sales ☜202(1)—Nonpayment of price does not defeat passage of title.**

The mere fact that the consideration is unpaid in a cash transaction does not always prevent the title to personal property from passing to the purchaser.

4. **Sales ☜199—Passing of title determined by intention.**

The passage of title of personal property sold is usually controlled by the parties' intention.

5. **Sales ☜234(3)—Bona fide purchaser of one with no title or conditional title not protected.**

In the absence of a contrary statutory rule, a bona fide purchaser of personal property for value from one who has no actual title, or only a conditional title, can acquire no greater rights than his vendor had.

6. **Sales ☜235(4)—Conditional sales statute not applicable to sales where conditional payment made.**

The statute converting conditional sales into chattel mortgages, and requiring their registration to protect the mortgagee against the claims of bona fide purchasers, is inapplicable to sales conditional in the sense that payment is conditioned on the honoring upon presentation of the draft given for the price, especially where the draft is a forged one, and the seller is induced to take it by fraud.

Appeal from District Court, Lamar County; A. P. Dohoney, Judge.

Suit by S. W. Gose and another against George A. Brooks. From judgment for defendant, plaintiffs appeal. Reformed and affirmed.

E. S. Connor, of Paris, for appellants.
B. B. Sturgeon, of Paris, for appellee.

HODGES, J. In January, 1920, appellants, Gose and Lancaster, sued the appellee, Brooks, for the recovery of certain live stock fully described in their petition. Brooks defended upon the ground that he was lienholder in possession under the terms of a mortgage given by one who called himself J. R. Jordan, and who at the time claimed to own the stock. The facts, about which there is little or no controversy, are substantially as follows:

[1] On January 1, 1920, a young man representing himself as J. R. Jordan, and a nephew of J. R. Jordan, of Arcadia, La., appeared in Paris, Tex., as a purchaser of mules for shipment. He applied to the appellee, Brooks, who was at the time the owner of a wagon yard at Paris, for information concerning dealers in large mules. Brooks referred him to several parties, among whom were the appellants, who resided at Honey Grove, in Fannin county. On the day following Jordan visited Honey Grove and contracted for the purchase of nine large mules from the appellants. The purchase price was $2,900, to be paid in cash. The mules were to be delivered at Paris. The transaction on the part of the appellants was conducted by Gose. The young man represented to Gose that his name was J. R. Jordan; that he was a nephew of an-

other J. R. Jordan of Arcadia, La.; that they two had formed a partnership for the purpose of purchasing mules, and this purchase was for the firm. After the terms had been agreed upon, Jordan offered the following draft in payment:

"January 2, 1920.

"Pay to the order of The First National Bank of Honey Grove, Texas, Twenty-Nine Hundred Dollars, for value received, and charge the same to account of ———. With exchange. Eight mules and one horse. [Signed] J. R. Jordan.

"To First National Bank, Arcadia, La."

Before accepting the draft Gose requested the cashier of the Honey Grove Bank to ascertain by wire if the draft would be paid by the Louisiana bank. The cashier then sent the following message:

"First National Bank, Arcadia, Louisiana: Will you pay J. R. Jordan's draft for twenty-nine hundred dollars?"

Later in the day the following reply was received:

"J. R. Jordan's draft for twenty-nine hundred dollars will be paid."

Upon receiving that information Gose sent the mules through the country to Paris. He and Jordan preceded them in a car, and arrived at the wagon yard of the appellee, Brooks, about 30 minutes in advance of the mules. Brooks being absent, arrangements were made with his son, Raymond Brooks, who was in charge, for keeping the mules overnight. When the mules arrived they were turned into a pen and fed. Before separating that night, and while at the wagon yard, Gose sold a horse to Jordan for $100, and took Jordan's check on the Louisiana bank for the amount. Raymond Brooks testified that he was present, and heard Gose and Jordan make the trade about the horse, and also heard them conversing in a way which convinced him that Gose had sold the mules to Jordan. He also testified that he told his father that night about the mules being in the wagon yard, and about what occurred indicating that they had been sold by Gose to Jordan. Brooks did not go to the wagon yard till the following morning. He did not see Gose, but met with Jordan, to whom he sold eight small mules for the sum of $1,400. In payment for these Jordan gave Brooks a draft on the same bank at Arcadia, La. This transaction occurred about 9 o'clock a. m. The mules delivered by Gose were still in the wagon yard. A few minutes after purchasing the mules from Brooks, Jordan asked Brooks for a loan of $1,400, stating he wanted to buy more mules, but that the people around there would not take a check on a Louisiana bank. He agreed to give Brooks a lien on the mules purchased from Gose to secure payment. This was satisfactory to Brooks, and the loan was made. No note was tak-

en, nor was any written mortgage executed. It was verbally agreed between them that Brooks should hold possession of the mules till the loan was repaid. Brooks testified that he thought Jordan had purchased the mules from Gose and that he had a right to mortgage them. He relied upon the information received from his son about what occurred between Jordan and Gose the previous night at the wagon yard. It later developed that this young man who represented himself to be J. R. Jordan, a nephew of J. R. Jordan, of Arcadia, La., was an impostor. After the conversation with Brooks at the bank when the loan was made the man disappeared and has never been heard from since. Neither of the appellants knew anything about the transactions between Brooks and Jordan till later. The checks and drafts given by Jordan for the purchase money of the mules were pronounced forgeries by the Louisiana bank and returned unpaid. There was a J. R. Jordan, a responsible dealer in mules, who resided at Arcadia, La., and whose credit was good at the Louisiana bank for the amount of the drafts at the time they were drawn, but that J. R. Jordan knew nothing of the young man who had passed as his nephew. After discovering the fraud, Gose and Lancaster immediately claimed the mules and attempted to regain possession of them. Brooks resisted their claims upon the ground that he was an innocent mortgagee for value, in possession, and was entitled to be protected as such. Gose and Lancaster instituted this suit, and procured a writ of sequestration, which was levied upon the mules. These were replevied by Brooks, and later an agreement in writing between the parties was entered into by which the sum of $1,800 was deposited by the appellants in court, to be disposed of in the final judgment, in order that the mules might be turned over to them. It was also agreed that during the time the mules were in Brooks' possession he expended $225 for feed and care of them.

The case was tried before the court, and at the request of the parties he filed findings of fact which are substantially the same as those above stated. In order to determine the grounds upon which he based his judgment, we quote the following from his conclusions:

"At the time the defendant loaned the $1,400.00 aforesaid to the said Jordan he had no notice of the fraud, forgery, or swindling transaction by which the said Jordan had obtained possession of the plaintiffs' property, and that he occupied the position of an innocent purchaser without notice of the want of title in J. R. Jordan, or want of any actual power or right to mortgage or dispose of said property. * * * From the foregoing facts I conclude that the plaintiff Gose, by his words and actions, clothed the said J. R. Jordan with apparent title to the property in controversy, and apparent authority to deal with it as his own, and

that the plaintiffs are estopped, as against the defendant, from questioning the title of the said J. R. Jordan to said property and his apparent authority to dispose of it."

Judgment was rendered in favor of Brooks upon the agreement above referred to for the sum of $1,625, that being the amount of his loan and the cost of feeding the stock.

It is apparent from this record that all of the parties to this controversy were the victims of an imposture, and that the loan made by Brooks must be lost by him or the appellants. In the absence of any material conflict in the evidence, the rights of the parties can be determined by an inquiry into the appropriate rules of law. If in the dealings between Gose and the stranger, who will be referred to as Jordan, the title to the mules did not pass with the delivery of possession, then the appellants remained the legal owners, and may reclaim their property, free from the incumbrance held by Brooks, unless they so conducted themselves as to create an estoppel against the assertion of that title. In transactions of this character the rule is thus stated:

"An owner who is induced by fraud to part with the possession, and not the title, of his goods, may recover them even from one who has paid value for them without notice of his right. But, if he be so induced to sell his personal property to another, by proving the fraud, he may recover of the vendee, and of any one holding under him, save a bona fide purchaser for a valuable consideration." Rohrbough v. Leopold, 68 Tex. 254, 4 S. W. 460; Hall & Brown v. Brown, 82 Tex. 472, 17 S. W. 715; 23 R. C. L. pp. 1300–02, and cases cited in the notes.

The author of the last-mentioned work thus states the rule based upon the cases he cites:

"Where there is a mistake on the part of the seller as to the identity of the buyer, as where the buyer is an impostor, even though there is such a delivery of the subject-matter of the sale as would ordinarily transfer the title, it is generally held that no title passes, and the seller may recover the goods from a bona fide purchaser of the buyer; whereas if the sale was only voidable, as in case of a sale induced by the fraud of the buyer, it could not be avoided as against a bona fide purchaser from the buyer. But where the impostor appears personally before the buyer, though he represents himself to be another person and buys goods on credit, it has been said that there is a sale voidable merely for fraud, as the seller could not have supposed he was selling to any one other than the person present, and it would seem to follow, if this is true, that the impostor, in case the goods are delivered to him, could transfer a good title to a bona fide purchaser. And it has been expressly held that the title to property sold and delivered to one who fraudulently misrepresents his identity and executes his note for the purchase price passes out of the seller so that he cannot maintain detinue for the property against a purchaser from the impostor."

If this were a case in which the sale had been completed and the vendors were seeking a rescission of the contract and a recovery of both title and possession upon the ground of fraud, the rights of the parties would be materially different. In such an event a fraudulent vendee holding the title and possession would have the legal right to dispose of the property, and one who purchased from him for value and without notice of the fraud would be protected. The first question then is, did the legal title to the mules pass from the appellants at the time they delivered the possession to this man passing as Jordan?

The sale was for a cash consideration, but no cash was paid. The forged draft was not a payment, and its acceptance by Gose did not, under the circumstances, alter the character of the transaction. National Bank v. C., B. & N. Ry. Co., 44 Minn. 224, 46 N. W. 342, 560, 9 L. R. A. 263, 20 Am. St. Rep. 566; Kempner v. Vaughn, 174 S. W. 695; Johnson-Brinkman Commission Co. v. Central Bank, 116 Mo. 558, 22 S. W. 813, 38 Am. St. Rep. 615. The evidence shows that the draft was to be sent for collection direct to the Louisiana bank, and was not to take the circuitous route usually adopted by banks in such dealings. Hence one of the elements of a completed cash sale was lacking—the payment of the consideration. The finding of the trial court that the draft given to Gose was a forgery is, in effect, a finding that the drawer was not J. R. Jordan, and that he had no authority to sign the name of J. R. Jordan to the draft. If Gose intended for the legal title to pass with the possession it was upon the condition that the draft was genuine and would be paid upon presentation. It is clear that, had he known the truth, he would not have parted with the possession of the mules. The possession was secured from him by a fraud which amounted to a felony. Again, if any title passed, or was intended to pass, it was to the party for whom the purchase was ostensibly made, J. R. Jordan, of Arcadia, or the firm of which he was the responsible member. The impostor did not claim to be more than a partner, or representative, of the real Jordan. But that J. R. Jordan never made any claim to the property, nor did he have any connection with the transaction with Brooks. If the draft was a forgery, the drawer not the party he represented himself to be, and with no authority to purchase for the party in whose name he was pretending to deal, it would be difficult to imagine a situation which furnishes a stronger reason for treating the attempted purchase and sale as a nullity. In his findings of fact and conclusions of law the trial court uses the expression "apparent title" in a manner which indicated that he was of the opinion that the legal title did not pass to Jordan. That inference is strengthened

by the further fact that he based his judgment in favor of Brooks upon estoppel alone. A majority of the court are therefore of the opinion that because of the fraud, and the conditions under which it was committed, no title passed to Jordan from appellants, and Jordan had no right to incumber the property with a lien. It follows that, unless for some reason they are estopped, the appellants now have the right to reclaim their property free from the incumbrance. These views are, we think, supported by the following decisions: Allexander v. Swackhamer, 105 Ind. 81, 4 N. E. 433, 5 N. E. 908, 55 Am. St. Rep. 180; Peters Box & Lbr. Co. v. Lesh, 119 Ind. 98, 20 N. E. 291, 12 Am. St. Rep. 367; School Sisters of Notre Dame v. Kusnitt, 125 Md. 323, 93 Atl. 928, L. R. A. 1916D, 792; Mechem on Sales, p. 740.

The next question is, was the honorable trial court correct in holding that the appellants are estopped from claiming the mules? One who depends upon an equitable estoppel to defeat the claim of the true owner has the burden of proving all the facts required to establish that defense. Bowen v. Lansing Wagon Works, 91 Tex. 385, 43 S. W. 872. A purchaser relying upon estoppel must not only show that he paid a valuable consideration, but that he had no notice of the superior claim of the party holding the title. If in this case the evidence lacks the fulness essential to make that defense complete, the consequences of the omission must fall upon the appellee alone. The rule of estoppel is founded upon the principle of justice, and is applied only in order to prevent the perpetration of a wrong. It assumes guilt in one party and innocence in the other. Where both parties are equally innocent, there is no good reason why the true owner should not claim that which is legally his. It is true an owner may at times lose without having committed any offense, but in such cases his loss is justified by other equitable rules, not that of estoppel. In order to support the judgment in this case, the facts must warrant the conclusion that the true owners of the mules were guilty of some culpable conduct which misled Brooks as to the true status of the title. It must appear that they did something with the intention of misleading him, or were guilty of some form of negligence calculated to produce a deception. Westbrook v. Guderian et al., 3 Tex. Civ. App. 406, 22 S. W. 59, and cases therein referred to. In the case cited Justice Key has pushed the defense of estoppel to the utmost limits to which it may be safely carried for the purpose of protecting an innocent purchaser without impairing the rights of an equally innocent owner. But even in that case he predicated the estoppel upon the ground that there had been culpable negligence on the part of the one estopped. There is no pretense in this case that Gose did any act, or made any declarations, for the purpose of leading Brooks to believe that a sale of the mules had been completed, or that the trade was upon terms and conditions different from those which actually existed. The evidence shows that Gose had no reason to believe that Brooks might be called upon for a loan by Jordan, or that Brooks would do anything upon the faith of a sale having been made.

We come, then, to the question, was Gose, who conducted the dealings with Jordan, in delivering the possession of the mules, guilty of negligence calculated to mislead Brooks as to the true state of the title? It is contended that Gose by that act clothed Jordan with all the appearance of a good title, and impliedly invited third parties to deal with him as the owner of the mules. It has been held that one who by his voluntary act delivers possesion of personal property to another with the intention of conveying the title also, cannot set up a fraud on the part of his vendee against the claim of an innocent purchaser from the latter. However, an examination of those cases will show in each a state of facts materially different from those disclosed by this record. In most, if not in all, of them, the original vendor knew the identity of the fraudulent vendee, and intended to vest him with the power to dispose of the property. The fraud consisted of some act, or representation, which would make the transaction voidable only, and not absolutely void. It also appeared in those cases that the party invoking the estoppel did not have an opportunity equal to that of the party estopped to know of the probability of a fraud having been perpetrated. In this case Gose was deceived as to the identity of the man with whom he dealt. He did not in fact sell to this man individually, but to J. R. Jordan, of Arcadia, to whom he looked for the cash payment. Gose, therefore, never intended for the title to vest otherwise than in one whom he thought was the real purchaser. Brooks knew that this man was a stranger in that community and that he was unknown to Gose. He also knew that the impostor was pretending to buy for J. R. Jordan, of Arcadia, and was in possession of facts indicating that the latter was paying for mules with drafts drawn in the name of J. R. Jordan upon the Arcadia bank. In short, Brooks knew as much about the stranger, his business and methods, as did Gose. He also had an equal opportunity to ascertain whether or not he was an impostor. Gose had believered the mules to this man as the agent, or the representative, of the real J. R. Jordan, or of the firm. Brooks was bound to take notice of that character of delivery. He then had no warrant for dealing with the stranger in any other capacity than as such agent or representative. Suppose the transaction between Gose and the stranger

be treated as only a voidable contract, and that the real J. R. Jordan might have paid the purchase price and claimed the mules; could Brooks in that event assert a valid lien against Jordan? The money loaned by Brooks was for the private benefit of the pretender, who had no legal right to pledge the firm property as security for its repayment. There is nothing in this record which would estop the real J. R. Jordan from impeaching the validity of that lien had he elected to affirm the purchase made ostensibly for his benefit. It is true the Louisiana Jordan could not accept the benefits of the unauthorized agency without ratifying what the agent did in acquiring the property, but the loan made by Brooks was no part of the transaction with Gose. That grew out of a separate contract, and was expressly for a different purpose. The real Jordan could not be bound by that act unless he held the impostor out as his agent. That he had not done. If, when the sale is treated as a completed one, Brooks cannot sustain the validity of his lien, then for a stronger reason he must fail when the transaction upon which the sale depended was void because of the fraud. We therefore conclude that, in delivering possession of the mules to the impostor, Gose acted under a deception resulting from a fraud, and was not guilty of any culpable negligence. We are of the opinion that the appellants are entitled to the possession of the mules free from the incumbrance asserted by Brooks.

[2] It appears from the record that the judgment in this case included $225 due Brooks for feeding and caring for the stock during the time they were in his possession. He is clearly entitled to the payment of that sum as a condition upon which the mules should be delivered to the appellants. The judgment will therefore be reformed and his recovery limited to that amount. Judgment will also be here rendered in favor of the appellants for all costs both of this court and the court below.

WILLSON, C. J. (dissenting) I do not agree the judgment should be reformed as determined by the other members of the court, but think it should be affirmed as it was rendered by the trial court. That court's findings of fact and conclusions of law are as follows:

"(1) I find that on the 1st day of January, 1920, a person representing himself to be J. R. Jordan, of Arcadia, La., and hereafter referred to as J. R. Jordan, and further representing himself to be a nephew of J. R. Jordan of said place, and a partner with him engaged in the business of buying and selling mules, went to the wagon yard of the defendant, Brooks, in Paris, Texas, and stated to said Brooks that he desired to buy a car load of mules, consisting of one-half small mules and one-half large mules, for said firm; that he entered into negotiations with the defendant for the purchase of the small mules required, and was referred by said Brooks to several dealers in Paris who handled large mules, and to the plaintiff Gose, in Honey Grove, Texas; that on the next day said J. R. Jordan went to the plaintiffs' place of business in Honey Grove, making substantially the same representations to the plaintiff Gose that he had made to Brooks, and entered into a contract with said Gose for the purchase of eight head of mules and one horse; as payment for said stock said J. R. Jordan drew a draft in the sum of $2,900 on the First National Bank of Arcadia, Louisiana, in favor of the First National Bank of Honey Grove, which was credited to the plaintiffs, and later charged back to them on account of the facts hereinafter stated; that at the instance of the plaintiff Gose the Honey Grove bank wired the Arcadia bank and was advised by the latter bank that J. R. Jordan's draft in said amount was good; that on the same day the plaintiff Gose and the said Jordan came to Paris in Gose's car, and plaintiff caused the said mules to be brought to Paris, and the same were by the plaintiff Gose delivered to Jordan in the defendant's wagon yard in Paris, Texas; that at the same time the plaintiff Gose sold the said Jordan a saddle horse that had been ridden from Honey Grove to Paris by one of his men in bringing said mules and horses to Paris, and received as payment therefor said Jordan's check on the First National Bank of Arcadia, La., in the sum of $100, which said horse was delivered to the said Jordan with the nine head of stock aforesaid; that said nine head of stock was delivered and said horse sold to the said Jordan in defendant's wagon yard by the plaintiff in the presence of defendant's employés, one of them being the defendant's son, and plaintiff said during the transaction, in the presence of defendant's employés, that he had sold said stock to said Jordan, all of which was communicated to the defendant that night by defendant's son.

"(2) That on the next day, to wit, January 3, 1920, the said J. R. Jordan requested a loan from the defendant, offering as security the mules and horses in defendant's possession purchased from the plaintiff as aforesaid, and that the defendant, Brooks, did on said date loan the said Jordan the sum of $1,400, and accepted as security therefor the mules and horses aforesaid, which were by agreement between Jordan and the defendant left in the defendant's possession as a pledge to secure said loan, and that the defendant went to his bank with the said Jordan and drew out the sum of $1,400, and paid it over to said Jordan on said date.

"(3) I further find that the person representing himself to the parties to this suit as J. R. Jordan was not connected in a business or any other way with J. R. Jordan of Arcadia, La., who appears from the evidence in this case to be engaged in the mule business, and to be financially responsible: and that the draft aforesaid and the check delivered to the plaintiff in Paris, Texas, are forgeries; all of which facts were unknown to the plaintiff at the time of the transaction herein referred to, and were not discovered by him until several days later.

"(4) That at the time the defendant loaned the $1,400 aforesaid to the said Jordan he had no notice of the fraud, forgery, and swindling transaction by which the said Jordan had ob-

tained possession of the plaintiffs' property, and that he occupied a position of innocent purchaser, without notice of the want of title in J. R. Jordan, or want of any actual power or right to mortgage or dispose of said property.

"From the foregoing facts I conclude that the plaintiff Gose, by his words and actions, clothed the said J. R. Jordan with apparent title to the property in controversy, and apparent authority to deal with it as his own, and that the plaintiffs are estopped, as against the defendant, from now questioning the title of said Jordan to said property and his apparent authority to dispose of it."

None of the findings is attacked by appellants in the assignments in their brief.

With reference to the first question discussed in the opinion of the majority, it will be noted that the trial court did not determine whether the effect of the transaction between appellants and the person they dealt with was to pass the title to the horse and mules from the former to the latter or not. The conclusion of the majority that the transaction did not have that effect was not warranted, unless it should be said it appeared from the testimony as a matter of law that the title did not pass. That it did not so appear is plain, I think. It is true that appellants testified, and the trial court found, that the sale by appellants was for cash, and that no cash was paid. But the fact alone that the sale was for cash, which was never paid, did not warrant the conclusion that the title remained in appellants, notwithstanding they delivered the property to Jordan. The rules with reference to such sales are stated as follows in 35 Cyc. 323 to 328:

"While sales made for cash or cash on delivery are not, strictly speaking, conditional sales, they are frequently so called, and are conditional in the sense that payment is to be precedent to, or at least concurrent with, delivery.

"So it is ordinarily held that where the sale is expressly for cash, or cash on delivery, no title passes to the buyer until payment is made, unless the condition as to payment is waived by the seller, although there may have been a delivery of the goods. * * * A cash sale is not, however, necessarily a conditional sale; but although it is expressly for cash, or cash on delivery, payment of the price may or may not be a condition precedent to the transfer of title, according to the intention of the parties. If by the use of such terms the parties understand merely that no credit is to be given, and that the seller will insist upon his right to retain possession until payment is made, the contract is so far executed as to pass title to the buyer; but if it is understood that the property in the goods is to remain in the seller until the price is paid, no title passes until payment. Even where the contract does not expressly provide as to the time of payment, if there is no provision for credit it will be presumed that the sale is for cash, and that payment and delivery are to be concurrent, so that until payment is made the buyer acquires no right to possession; but whether payment is a condi-tion precedent to the passing of title depends primarily upon the intention of the parties. In some cases it has been held that since, where the time of payment is not stipulated, the sale is presumed to be for cash, the general rule as to cash sales applies, and that title does not pass until payment is made unless the condition is waived, particularly if there has been no delivery. Other cases, however, apply the general rule previously stated in regard to unconditional sales, holding that if the goods are specific, and the contract is otherwise complete, the property, unless a contrary intention appears, passes at once, subject to the seller's lien, so as to place the goods at the risk of the buyer, although he is not entitled to possession until payment is made or tendered. This rule does not apply, however, if there is any other condition to be performed or act done with reference to the thing sold, for the purpose of identifying it, putting it in a deliverable state, or ascertaining the price. Of course if by the contract payment of the price is a condition on which the passing of the property depends, the property will not pass until the condition is fulfilled.

"Where by the contract the giving of a note or other security in payment of the price is a condition on which the transfer of the property depends, the property does not pass until the condition is fulfilled, unless the condition is waived; but the mere fact that the payment is to be made in this manner is not inconsistent with the immediate transfer of the property, if such is the intention; and where the intention is not clear the question is one of fact, dependent on all the circumstances. The condition may be waived by the seller as by an unconditional delivery of the goods. Unless a different intention appears, however, where the goods are to be paid for on delivery by bill, note, or other security, it is generally held that this is a condition precedent to the transfer of the property, and that unless that condition is waived the title will not pass until it is complied with, although there has been a delivery of the goods.

"The condition as to payment or security is one which may be waived by the seller, in which case title to the goods sold will vest in the buyer, although the condition has not been performed. Such condition will ordinarily be held to be waived by an unconditional delivery of the goods by the seller to the buyer without requiring payment or security, provided it is not secured by fraud, even though the delivery is constructive, or is made to a carrier. The fact that there has been a delivery without requiring payment or security does not, however, necessarily constitute a waiver of such condition, but merely creates a presumption to this effect, which will not control if it otherwise appears that the delivery was not intended to be absolute, but was merely conditional. Whether the delivery is conditional or unconditional depends primarily upon the intention of the parties as shown by all the facts and circumstances of the case, and so it is ordinarily a question of fact for the jury. If a sale is for cash, the mere acceptance of a check does not constitute an absolute payment or waiver of the condition as to payment.

"Where the seller delivers the goods conditionally, and without any intention of waiving

payment or security, the property does not pass; and, in order to render a delivery conditional within the application of this rule, it is not necessary that there should be any express declaration to that effect, but it is sufficient if it appears that such was the understanding of the parties, or that the delivery was made in the expectation of immediate payment; the question being primarily one of intention, as shown by all the facts and circumstances of the case, although a mere secret or undisclosed intention on the part of the seller is not of itself sufficient to make the delivery conditional. So if the seller delivers on an understanding, express or implied, that he is to receive immediate payment or security, he may reclaim the goods, or if he delivers on payment by check in lieu of cash, and the check is dishonored, he may reclaim the property."

Of course, what is said in the quotation about the right of the seller to reclaim goods he sold applies unqualifiedly only to his right as against the person he sold to, and not to innocent purchasers from that person. Whether he would have such right as against such a purchaser would depend on whether the sale in the first instance was void or merely voidable. If it was void he could reclaim, unless estopped, even against such a purchaser; but if it was merely voidable, he could not.

I do not understand the testimony to show, as is held by the majority, that the sale by appellants was void, but merely that it was voidable, at appellants' instance, for fraud practiced on them. The conclusion to the contrary reached by the majority seems to be based mainly on the view that it conclusively appeared that the intention of the parties was that the title should not pass until the purchase price was paid, and on the view that it further so appeared that the sale was not to the party with whom appellants dealt, but to the J. R. Jordan whom he represented to be his partner.

As to the latter view, I think it is not warranted by the testimony nor supported by the law. While it appeared from the testimony that the party with whom appellants dealt was not a partner of the J. R. Jordan who resided at Arcadia, La., the fact remains that the sale was not to that Jordan alone, but to him and the other J. R. Jordan as partners. There is no better reason in the testimony for saying the sale was to the Arcadia Jordan alone than for saying it was to the Jordan with whom appellants dealt alone. The case of Martin v. Green, 117 Me. 138, 102 Atl. 977, decided by the Supreme Court of Maine, was in some respects like this one. Green was a dealer in horses at Bangor. A person representing himself to be Frank E. Towle, of Winn, purchased a horse of Green, giving notes signed "Frank E. Towle" for the purchase price and a mortgage on the horse as security. The purchaser's name was not Towle, but Roche, and he did not reside at Winn. Three days later Roche sold the horse to one Costley, who knew nothing about the transaction between Roche and Green. The contention was that the sale by Green to Roche was void because of the deception practiced by the latter. In disposing of the contention the court said:

"All the elements of a sale were present and the minds of the parties met. They agreed upon the article to be sold, and the price and the terms of payment. Nor was there any doubt as to who was the vendor and who was the vendee. Green intended to sell to the identical man before him, with whom he was dealing, whatever his name might be, and to take back a mortgage from that man. That actual intent governs. 'Presentia corporis tollit errorem nominis.' Identification by the senses overrides description. The act followed the intent, and the horse was delivered to the intended vendee. It was what it termed a de facto contract of sale, and title thereby passed, to be defeated because of fraud only-as between vendor and vendee, or as between vendor and a purchaser having knowledge of the infirmity [citing authorities]. * * * The principle of the passing of title under a de facto contract is not to be confused with a line of cases where the swindling vendee acts, not for himself, but represents that he is the agent of, or is acting for, a third party. In such a case it has been held that no title passes because the vendor does not intend to sell to the party with whom he is personally dealing, but with the third party, for whom the swindler claims to be acting, but is not."

As to the view that it conclusively appeared that the intention of the parties was that the title should not pass until the purchase price was paid, I think it also is not warranted by the testimony. Appellant Gose as a witness testified:

"I sold him (Jordan) the mules and one horse for $2,900. The same was not made on credit; it was for cash. He did not make any representation to me in words as to how he was going to pay that cash. He said, 'We will go to the bank and get a draft,' and we went to the bank and got it. When we got to the bank he gave a draft on Arcadia, La., payable to the First National Bank of Honey Grove, and the bank gave us credit for it. I did not agree to accept that draft in lieu of cash. I took it as cash. I did not take the draft at all. He gave it to the bank, and the bank paid it to us. This man Jordan told me to deliver this stock to Brooks' wagon yard here in Paris, and I agreed to deliver them there for him. I did deliver the stock to Brooks' wagon yard in Paris. * * * That was on Friday night the 2d of January. I delivered the mules to Jordan himself. * * * When I sold him the horse for $100 he said: 'I wish I had bought him before and included it in the draft. I'll give you a check for that.' I sold this fellow Jordan these mules, and in company with Jordan I delivered them here in Paris at the defendant's (Brooks') wagon yard. * * * I do state to the court that I traded with Jordan and relied upon what he said; that I transferred the property down here, and turned it over to Jordan, in Mr. Brooks' wagon yard. * * * As to whether I

understood that the man who signed these checks signed his name or his partner's name, the name signed to them was J. R. Jordan, and he said his name was J. R. Jordan, and his uncle's name was J. R. Jordan, and he was the purchasing agent of the firm, and that his uncle sold the stock. He bought all the mules principally, but did not sell any mules himself. As to whether I know whether the name he signed was his own or his uncle's, it was both. They both had the same name, and I know that he signed it. I do not know whether he intended it to be his own name or his uncle's. I don't know anything about that. * * * He did not sign his uncle's name to the check. He said he was one of the firm, and he signed his own name to the checks. He claimed he was signing his own name to them."

McCleary, the cashier of the Honey Grove National Bank, testified that he credited appellants with the amount of the $2,900 draft at the time it was drawn, and afterwards, when he learned it was worthless, charged it back to them. He further testified that on the Monday following the Friday when appellants sold the stock he was told by the Arcadia First National Bank over the 'phone that the "draft was paid and remitted," and later the same day was told the same thing by that bank in another conversation he had over the 'phone. He learned on the next Wednesday the draft was worthless. When McCleary's bank got the check back from the Arcadia bank he found it had been marked "Paid" on the Monday he had the 'phone conversation referred to above. The witness further testified:

"Our bank paid this draft. We credited it the same as Mr. Gose and Mr. Lancaster having the money. I sent it to the bank down yonder, and they also paid it. It shows they paid it on the 5th. Our bank, Mr. Gose, and Mr. Lancaster and the bank at Arcadia were all saying that the check was good and that it had been paid up to January 5th. We did not find out there was anything wrong with it until the 7th; that is, the bank did not."

The testimony quoted is substantially all there was on the issue as to whether the title passed from appellants or not. All of it, it will be noted, is consistent with the presumption the law would raise from the fact that the property was actually, and, I think it may be said, unconditionally, delivered, that the title passed from the seller to the buyer. As I view the testimony, the case is the ordinary one where a seller is induced by fraud to transfer his property to a fraudulent buyer. If it is not that, then plainly this court had no right to dispose of the appeal as it has disposed of it, unless it could say it appeared from the testimony as a matter of law that the intention of the parties to the transaction was that the title should not pass until the purchase price of the property was paid.

But if I thought the testimony warranted the conclusion the majority reached with reference to the question of title, I still would think the judgment should be affirmed, for it was predicated entirely on estoppel which the trial court found, on sufficient testimony, I think, to exist in appellee's favor against appellants. That appellant Gose, "by his words and actions," quoting from the trial court's findings, "clothed said J. R. Jordan with apparent title to the property in controversy and apparent authority to deal with it as his own," I think is clear from the circumstances shown by the record and by the testimony that he, within the knowledge of appellee at the time he loaned the $1,400 to Jordan, actually delivered the horse and mules to Jordan, declaring at the time he did so that he had sold same to Jordan. The rule which I think is applicable to the case is stated in 35 Cyc. p. 357, as follows:

"While the general rule is that one who has no title to goods or authority to sell, but at most a mere possession, can transfer no property therein as against the true owner, even to a bona fide purchaser, yet, if the true owner has clothed him with apparent ownership, so that authority to sell may be implied, a bona fide purchaser will take the title free from any claim by the owner, as where there has been a delivery of the goods to the buyer, or where the sale is made by a trustee, or by an agent who had been clothed with apparent ownership and authority to sell."

And see page 359 of said work, where it is said:

"As a delivery of goods is usually effective to pass the title to the buyer, a bona fide purchaser from one upon whom apparent ownership has been conferred by delivery will be protected, even where the original purchase price has not been paid. In some cases it has been held that a delivery to the buyer will pass title so as to protect an innocent purchaser, irrespective of the terms of the contract or intention of the parties; but in other cases it is held that the rule does not apply if the passing of the title is conditional upon payment, or there is a reservation of the property in the goods, the decisions being based on the ground that a person without title can convey none."

And see 1 Mechem on Sales, §§ 156, 157; 24 R. C. L. pp. 23, 378; Frazier Co. v. Barrel Co., 162 Ky. 301, 172 S. W. 652.

### On Motion for Rehearing.

HODGES, J. [3] The mere fact that the consideration is unpaid in a cash transaction does not always prevent the title to personal property from passing to the purchaser. The writer did not, in the original opinion, mean to question that well-established rule. What was there said on that subject was intended to be considered with reference to the particular facts of this case only. No matter who the impostor was, had he paid cash for the mules the title would have passed from the seller. The same result would have followed had the seller taken the impostor's

note, or this oral promise to pay in the future, as the consideration for the sale. In the case of Martin v. Green, cited by Chief Justice Willson in his dissenting opinion, the sale was on time, and the consideration was a promise to pay in the future. The holding there announced is in accord with the weight of authority, but the court guardedly used the following language:

"The principle of the passing of title under a de facto contract is not to be confused with a line of cases where swindling vendee acts, not for himself, but represents that he is the agent of, or is acting for, a third party. In such a case it has been held that no title passes, because the vendor does not intend to sell to the party with whom he is personally dealing, but a third party, for whom the swindler claims to be acting but is not."

[4] We are not unmindful of the fact that in the sale of personal property the passage of title is usually controlled by the intention of the parties. It is also true that a fair inference from the facts in this case justifies the conclusion that Gose intended, when he delivered possession, to also part with the title. Had this man passing as J. R. Jordan, and as the agent of a firm composed of himself and another J. R. Jordan, been the man he represented himself to be, and the agent of the firm for which he claimed to act, or had the sale been to this man on time, based upon his personal credit, the situation would have been materially different. If Gose at the time of delivering possession had executed a written bill of sale conveying the title in accordance with the terms of his contract, the conveyance would have been to J. R. Jordan of Arcadia, La., or to the firm of which that J. R. Jordan was a member. But the facts show that no such firm existed, that this impostor held no such agency, and that he was not J. R. Jordan. The conclusion follows that Gose had no intention of investing this particular individual with the full title to the property.

[5] It is well settled that, in the absence of some statute establishing a contrary rule, a bona fide purchaser of personal property for value from one 'who has no actual title, or only a conditional title, can acquire no greater rights than his vendor held. Leath v. Uttley, 66 Tex. 82, 17 S. W. 401; City National Bank v. Lufts, 63 Tex. 113; Fairbanks, Morse & Co. v. Eureka Co., 67 Ala. 109; Weinstein v. Freyer, 93 Ala. 257, 9 South. 285, 12 L. R. A. 700; Public Parks Amusement Co. v. Embree-McLean Car Co., 64 Ark. 29, 40 S. W. 582, 24 R. C. L. pp. 455 and 456, and numerous authorities cited in the notes.

[6] Our statute which converts conditional sales into chattel mortgages, and requires their registration, in order to protect the mortgagee against the claims of bona fide purchasers, has no application to transactions of this character. That statute does not alter the common-law rule which treats possession alone by the conditional owner or any form of a bail as insufficient to estop the true owner from asserting his title as against an innocent vendee. If clothing with possession a purchaser who takes only a conditional title is not sufficient to estop the true owner from claiming against an innocent third party, there is no reason why the rule should be different when the true owner is induced by fraud to part with his possession. It is not claimed in this case that Gose did any more than deliver possession to the man passing as Jordan. No representations were made to any one with whom Brooks communicated as to the terms or conditions of the sale. Brooks acted solely upon information obtained from his son, who was a mere bystander, listening to a conversation not intended to influence any one, and without any notice that either he or any one else would act upon it.

The motion for a rehearing is overruled.

───────────────────

⊜⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes