**EL PASO NATIONAL BANK, Appellant,**

v.

**SOUTHWEST NUMISMATIC INVEST-MENT GROUP, LTD., Appellee.**

No. 6556.

Court of Civil Appeals of Texas, El Paso.

March 9, 1977.

Rehearing Denied April 13, 1977.

Grambling, Mounce, Deffebach, Sims, Hardie & Galatzan, J. Malcolm Harris, W. Dean Hester, El Paso, for appellant.

Mayfield, Broaddus & Perrenot, Francis C. Broaddus, Jr., El Paso, for appellee.

## OPINION

OSBORN, Justice.

This case arises from a suit brought by a bank against a depositor to recover the amount by which its checking account had become overdrawn. Although the depositor admitted liability on the check which caused the account to be overdrawn, it urged certain defenses which the trial Court, based on jury findings, concluded barred recovery by the Bank. The Bank appeals from a take nothing judgment. The depositor filed a cross-action seeking affirmative relief for its losses in transactions in which the Bank was involved, but, based on jury findings, it was denied any recovery. It makes no appeal.

This litigation arises from transactions involving El Paso Coin Company, Inc. (hereinafter called "Coin Company"), Southwest Numismatic Investment Group, Ltd. (hereinafter called "Southwest"), and El Paso National Bank (hereinafter called "Bank"). The Coin Company is a corporation with a paid-in capital of $6,727.50, and whose principal stockholder is Renato Ruiz. Dealing primarily in gold bullion coins, at the time of its collapse in September, 1974, the Company's volume of sales was $8,000,000.00 per month. It is now bankrupt. Southwest is a limited partnership composed of 86 partners and having a paid-in capital of $764,-000.00. Renato Ruiz was a general partner,

although William P. Hooten served as managing partner since early 1973.

Both parties had accounts at the Bank and maintained offices in the Bank building. The parties' accounts were supervised by Harold Browning, a Senior Vice President for the Bank. In 1974, the Bank received and paid more than 2,000 insufficient funds checks drawn on the Coin Company account. Of course, deposits were being made continually to cover such checks and during the last three months of operation the account was actually overdrawn only 3 days in July, 4 days in August, and 10 days in September when the Company collapsed and business terminated. On September 19th, the account had a balance of $11,-538.97, but by September 25th it was overdrawn by $644,552.34. Ultimately, the overdrafts went to $1,224,767.64. Its Statement of Account on September 30th shows a $700,000.00 credit for inventory received by the Bank, leaving the account overdrawn in the amount of $524,767.74.

A substantial portion of the business of Southwest was with the Coin Company. Because of the rising market in gold coins, those who were dealing in the coin business often would never receive delivery of their coins before they would be resold. For some time prior to the Coin Company's collapse, bulk purchases of bullion were handled by bank-to-bank shipments, so that coins were delivered to the Bank's collection department and held by it until they were redeemed by payment therefor by the Coin Company to the Bank. When Southwest purchased coins from the Coin Company, it was necessary for Southwest to pay for the coins in advance, then the funds were deposited to the Coin Company's account, after which the redeemed coins were delivered to Southwest. Because of the requirement of payment in advance and the in-bank delay in delivery, Southwest and the Coin Company agreed that if coins were not delivered within two or three days after a sale, this delay in delivery would constitute a "repurchase" by the Coin Company of the coins for which Southwest had made payment. It was also agreed that such repur-

chase would result in repayment to Southwest of the amount which it had paid plus a profit to Southwest. This buy-back arrangement had been accomplished between Southwest and the Coin Company on several occasions.

On September 6, 1974, Southwest purchased from the Coin Company 1,000 Mexican 50-peso gold pieces at $209.00 each, and paid the Coin Company by its check for $209,000.00, which was then deposited to the Coin Company's account at the Bank. When the coins were not delivered in accordance with the parties' agreement, the transaction was treated as a repurchase by the Coin Company. On September 19th, Mr. Ruiz agreed that the Coin Company had repurchased the 1,000 pesos and delivered to Southwest the Coin Company's check for $209,000.00. No profit was realized on this particular repurchase, but the Coin Company took a loss of $20,000.00 because of the decreasing price of gold. At the same time, Hooten agreed to make a purchase of 1,300 Austrian 100-corona pieces for $207,350.00, and he gave Mr. Ruiz Southwest's check for that amount. At the same time, it was agreed that Mr. Hooten would not deposit the Coin Company's check for $209,000.00 until the next business day so that, with the deposit of Southwest's check, the Coin Company could redeem coins from the Bank for delivery. At the time the two checks were exchanged, Southwest had a balance in its account at the Bank of $50,922.16.

On some eleven prior occasions when a Southwest check had been presented for payment for an amount in excess of its current account, Mr. Browning had checked with Mr. Hooten concerning deposits to be made which would cover the outstanding check. In each instance when Mr. Hooten had given him an assurance that he had a Coin Company check to deposit, the Southwest check in excess of the current account was paid, rather than being returned because of insufficient funds. When Southwest's check for $207,350.00 was deposited by the Coin Company on September 19, 1974, it was delivered to Mr. Browning in the Bank because the account was insuffi-

cient to make payment. On this occasion, Mr. Browning did not check with Mr. Hooten concerning whether or not he was about to make a deposit which would cover this particular check, but, instead, he relied upon a representation from Mr. Ruiz that Southwest did have a Coin Company check for deposit the following day, which would be sufficient with funds then in the account to pay Southwest's check. Mr. Browning then approved the check for payment, resulting in Southwest's account being overdrawn in the amount of $153,276.76. The next day, Mr. Ruiz placed a stop payment order against the Coin Company's $209,-000.00 check, and when that check was deposited on September 20th, it could not be paid and Southwest's account was insufficient by the amount for which the Bank brought this suit.

The evidence reflected that on other occasions when the Bank had received a stop payment order, it customarily notified a customer or correspondent bank, either by telephone or wire, as a courtesy to protect against a loss. On this occasion, the Bank did not call Southwest to advise of the stop payment order, but, instead, returned the check with the stop payment order by depositing the same in the mail on the next business day, Monday, September 23rd. Such notice was delivered to Southwest on September 25th, the same day the Coin Company collapsed and the Bank took over all of its accounts and inventory. Thus, Southwest was left with its check for $207,-350.00 being charged to its account, and the Austrian coins were never delivered. The Bank having taken over the Coin Company's inventory, delivery could not be made. In addition, Southwest lost the $50,922.16 in its account on September 19th which was used in part to pay for the check it gave to the Coin Company.

While Southwest admits its liability on its check to the Coin Company and recognizes its responsibility to the Bank for the amount in which its account was overdrawn, it asserts that there is no liability to the Bank by reason of its defenses under the doctrines of waiver and estoppel. It asserts that even though the Bank had an absolute right to return its September 19th check to the Coin Company, that the Bank, acting through Mr. Browning, had waived such right and had established a procedure whereby no checks which would normally be insufficient for payment would be returned without Mr. Browning having first determined that Southwest had other checks to deposit which would make its account sufficient to pay any outstanding check which had already been presented for payment, and that when Mr. Browning failed to check with Mr. Hooten on September 19th about a pending deposit and, instead, okayed the check for payment, he did not comply with existing Bank customs under which it had previously waived its right to return insufficient funds checks.

In addition, Southwest asserted that the Bank's prior conduct had induced a reasonable belief in Hooten's mind that the Bank would not declare an overdraft without giving notice to Southwest of such an occurrence, and that by reason of such conduct, the Bank is now estopped to assert an overdraft on this particular check. Southwest asserts that its contentions were sustained in the jury findings in answer to Questions Nos. 3 through 7, which were as follows:

"QUESTION NO. 3

"Do you find from a preponderance of the evidence that the El Paso National Bank established a policy or procedure of authorizing outstanding checks of the Group to be charged against its account, even though thus creating an overdraft, in reliance on obtaining an assurance from William P. Hooten that he then held a check of the Coin Company for deposit to the Group's account in a sufficient amount to cover such outstanding checks?

"Answer 'El Paso National Bank did' or 'El Paso National Bank did not'

"Answer: *'El Paso National Bank did'*

"If you have answered the preceding question 'El Paso National Bank did,' then, but not otherwise, answer the following question:

"QUESTION NO. 4

"Do you find from a preponderance of the evidence that on September 20, 1974, in authorizing the $207,350 check which the Group had delivered to the Coin Company to be charged against the Group's account, the El Paso National Bank abandoned its prior policy of relying upon an assurance from William P. Hooten and instead relied upon the assurance of Renato Ruiz, President of the El Paso Coin Company, Inc., that a check of the Coin Company would be deposited to the Group's account of sufficient amount to cover the said $207,350 check?

"Answer 'El Paso National Bank abandoned' or 'El Paso National Bank did not abandon'

"Answer:    'El Paso National Bank Abandoned'

"QUESTION NO. 5

"Do you find from a preponderance of the evidence that the Bank by its prior course of action, if any, in supervising the accounts of the Coin Company and the Group, induced a reasonable belief in the mind of Hooten, acting on behalf of the Group, that said Bank would not declare an overdraft to have occurred in the Group Account without giving actual notice to said Group of the occurrence of such overdraft at the time such overdraft occurred?

"Answer 'yes' or 'no'

"Answer:  Yes

"If you have answered the preceding question 'yes,' then, but not otherwise, answer the following question:

"QUESTION NO. 6

"Do you find from a preponderance of the evidence that Hooten, acting on behalf of said Group, relied upon such prior conduct of the Bank, if any, in entering into the transaction in question with the Coin Company, to the extent that in good faith he believed that said Bank would not declare an overdraft to have occurred in the Group account without the Bank giving actual notice to the Group of the occurrence of such overdraft at the time the overdraft occurred?

"Answer 'yes' or 'no'

"Answer:  Yes

"If you have answered the preceding question 'yes,' then, but not otherwise answer the following question:

"QUESTION NO. 7

"Do you find from a preponderance of the evidence, that such reliance of Hooten, if any, upon the prior conduct of the Bank, if any, induced Hooten, acting on behalf of said Group, to act or fail to act in such a way as to result in an overdraft of the Group's account?

"Answer 'yes' or 'no'

"Answer:  Yes "

In other issues, the jury found that Southwest issued its check for $207,350.00 when the general partners knew that there were insufficient funds in the account for payment, that such conduct was negligence, and that such negligence was a proximate cause of Southwest's loss. They also found that the general partners of Southwest agreed to exchange insufficient funds checks with the Coin Company and agreed to delay the deposit of the Coin Company check in the Southwest account until the next business day, and that such was negligence and a proximate cause of Southwest's loss. The Bank contends that these issues establish the existence of a check kiting scheme in addition to the negligence involved.

## ISSUE OF WAIVER

The Bank first contends that the defense of waiver was never alleged. This is a plea which must be specifically pled, but where sufficient facts are alleged, it is sufficient notwithstanding that the word "waiver" is not used. 60 Tex.Jur.2d Waiver, Sec. 12 (1964). It appears that the allegations of Paragraph II of Southwest's "TRIAL AMENDMENT TO THE DEFENDANT'S ANSWER AND ITS CROSS-ACTION" contains allegations of fact sufficient to raise the theory of waiver based upon the Bank's operating procedure, although the word "waiver" was never used.

Even though we find the pleading raised the issue, we conclude that Questions

Nos. 3 and 4 do not establish waiver of the Bank's right to assert that Southwest's check created an overdraft. In *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Company*, 416 S.W.2d 396 (Tex.1967), the Court said:

> "Waiver has been frequently defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it. *Texas & P. Ry. Co. v. Wood*, 145 Tex. 534, 199 S.W.2d 652 (1947); *Rolison v. Puckett*, 145 Tex. 366, 198 S.W.2d 74 (1946). * * * "

In this case, there has been no finding that the Bank intentionally relinquished its right to assert that the check which it paid constituted an overdraft on the part of Southwest. Neither has there been any jury finding of intentional conduct inconsistent with the Bank's right to assert that it is entitled to be paid for the amount of the overdraft. Undoubtedly, the evidence did establish and the jury made a finding that the Bank had established a policy whereby it waived or abandoned its right to automatically return checks which created an overdraft, and rather than exercising that right it established a procedure whereby it would determine from Mr. Hooten that a deposit was being made which would cover a check which had been deposited for an amount in excess of Southwest's account. But, there is substantial difference between waiving a right to return a check which creates an overdraft and waiving the right to require the customer to make good the amount of an overdraft. The evidence establishes that in each of the cases where Mr. Browning had called Mr. Hooten about a check which created an overdraft, the Bank always required Southwest to make a deposit sufficient to cover the overdraft. (See Question No. 3). Such conduct does not indicate an intentional relinquishment of the right to require such a deposit or payment by its depositor, nor was such conduct inconsistent with claiming its right to require full payment of any check which created an overdraft.

In this case, we conclude that the Appellee has neither established as a matter of law nor obtained a jury finding of (1) an intention upon the part of the Bank to waive its right to declare that Southwest's check created an overdraft, or (2) some act upon the part of the Bank amounting to a surrender of its right to declare that the check created an overdraft. Each of these elements was an essential part of the Appellee's claim of waiver and there are no jury findings to establish such elements of this defense. Segrest, Waiver and Estoppel, 20 Baylor L.Rev. 325 at 332 (1968). Thus, waiver has not been established as a defense to Southwest's admitted liability on its check.

The conclusion which we have reached is required by the very issue upon which the Appellee relies. In Question No. 3, the jury found that even though the Bank established a policy of not returning insufficient funds checks and that this policy was based upon a reliance that the check would be covered by a deposit, that under such policy outstanding checks for more than Southwest's balance were charged against its account. Thus, the jury in effect found that the Bank, under its policy which abandoned its absolute right to return insufficient funds checks, did, nevertheless, charge those checks when they were paid against the account of Southwest. We can only conclude that waiver has not been established and it may not be asserted as a defense against its admission of liability on its check of September 19, 1974.

### ISSUE OF ESTOPPEL

In *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929 (1952), the Court set forth the element of an equitable estoppel in the following language:

> "On the question of estoppel we find that 'In order to constitute an equitable estoppel or estoppel in pais there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been

made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice.' 31 C.J.S. Estoppel § 67, page 254. * * * "

In those cases where the Courts have applied a "quasi estoppel," the same results have been reached as in an estoppel in pais, but in such instance it is held that no concealment or misrepresentation of existing facts on the one side, and no ignorance or reliance on the other, is a necessary element of the defense. 31 C.J.S. Estoppel § 107 (1964). One of the bases for this doctrine is in an election, and the principle precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. 31 C.J.S. Estoppel § 107 (1964).

It is the position of Southwest that the jury's answers to Questions Nos. 3 through 7 show that the Bank established a policy of accepting checks which created an overdraft on its account only upon an assurance from Mr. Hooten that a deposit would be made to cover such outstanding checks; that Southwest was relying upon such policy or procedure of the Bank when the Bank elected to rely upon assurances from the Coin Company as to the check for $207,350.00; and that such reliance induced Southwest to act or fail to act in such a way as to result in the overdraft of its account.

■ While the Bank denies that the findings are sufficient to establish an estoppel, it asserts that in any event Southwest cannot obtain such an equitable defense because of its own conduct. It relies upon the rule set forth in 31 C.J.S. Estoppel § 102 (1964), which states: "In no event can an estoppel arise in favor of one who has been guilty of contributory negligence." The basis for such rule, of course, is that an estoppel resting wholly on equity cannot be used to shift a loss from one careless person to another. The above quoted rule was followed in *City of Tyler v. Bruck*, 267 S.W.2d 429 (Tex.Civ.App.—Texarkana 1954, writ ref'd n. r. e.), where the Court pointed out that equity will not relieve a person from his erroneous acts or omissions resulting

from his own negligence. The same rule was applied in *Continental Credit Corporation v. Norman*, 303 S.W.2d 449 (Tex.Civ. App.—San Antonio 1957, writ ref'd n. r. e.), where Justice Pope, writing for the Court, said:

"The trial court concluded that both General Motors, the owner; and Continental, the mortgagee, were negligent. That conclusion defeats Continental's recovery. 'In no event can an estoppel arise in favor of one who has been guilty of contributory negligence.' 31 C.J.S. Estoppel §§ 102, 104; *City of Tyler v. Bruck*, Tex.Civ.App., 267 S.W.2d 429; *Holland v. Blanchard*, Tex.Civ.App., 262 S.W. 97, 102; *Sheffield Car Co. v. Constantine Hydraulic Co.*, 171 Mich. 423, 137 N.W. 305; accord, *Gose v. Brooks*, Tex. Civ.App., 229 S.W. 979, 938."

■ As noted earlier, the jury found that Southwest was negligent in issuing its check when the general partners knew that there were insufficient funds in the account for payment, and further that it was negligent in agreeing to exchange insufficient funds with the Coin Company and in agreeing to delay the deposit of the Coin Company check in its account until the next business day. Southwest makes no attack upon those jury findings, and, under the rule set forth above, they bar its right to assert the equitable defense of estoppel.

In addition, the Bank asserts that Southwest does not come into the Court with clean hands, and therefore it may not assert equitable grounds to relieve it from liability for its overdrawn account. The jury found in answer to Question No. 11 that there were insufficient funds in its account to pay such check. In answer to Question No. 20, the jury found that Southwest and the Coin Company agreed to exchange insufficient funds checks knowing that they were insufficient, and, further, that Southwest agreed to delay the deposit of the check it received from the Coin Company until after its own check had been deposited for payment. Section 32.41 of the Texas Penal Code provides that:

"(a) A person commits an offense if he issues or passes a check or similar sight order for the payment of money knowing that the issuer does not have sufficient funds in or on deposit with the bank or other drawee for the payment in full of the check or order as well as all other checks or orders outstanding at the time of issuance."

■ Clearly, under this Code provision, our standards of conduct prohibit the issuance of a check with the knowledge that sufficient funds are not on deposit for payment of such check, and one who acts in violation thereof does not have clean hands.

■ With regard to the applicability of the doctrine of estoppel by one whose own conduct attributes to his loss, the general rule is set forth in 31 C.J.S. Estoppel § 75 (1964), as follows:

"The doctrine of estoppel is for the protection of innocent persons, and only the innocent may invoke it. There is, in the very nature of the doctrine, some element of the maxim that one must come into a court of equity with clean hands. * * * A person may not predicate an estoppel in his favor on, or assert such estoppel for the purpose of making effective, obtaining the benefit of, or shielding himself from the results of, his own fraud, and, similarly, he may not do so with respect to his own dereliction of duty, violation of law, wrongful act, or other inequitable conduct in the transaction in question * * *."

Although the Court may have been in disagreement in *Champlin Oil & Refining Company v. Chastain*, 403 S.W.2d 376 (Tex. 1965), as to who had the burden of proof on the "clean hands" issue in a case involving an estoppel, it was obviously recognized that clean hands were required in order for estoppel to apply. Chief Justice Calvert, in his dissent on the motion for rehearing, said:

"I apprehend that 'clean hands' is not an affirmative defense to a plea of estoppel; it is a necessary predicate for the plea, and if it is an issuable fact under the evidence, the burden of obtaining a favorable finding is on the party asserting an estoppel. It is thus but one of the cluster of issues essential to the defense of estoppel."

In this case, Appellee did not meet that burden as part of its case. In fact, the Appellant accepted the burden and obtained jury findings of conduct which established that Appellant did not have "clean hands." Thus, we also conclude that estoppel is not applicable for this additional reason.

We sustain the Appellant's Points of Error I, II, III, V and VI. The Appellee having admitted liability for the amount of its overdrawn account in the sum of $153,276.76, and having failed to establish a defense to such admitted liability, the Bank is entitled to judgment for such sum plus interest at the rate of nine percent (9%) per annum from the date of the trial Court's judgment.