FASKEN LAND AND MINERALS, LTD., Crane Avenue, Inc., and D.H. Acquisition, Ltd., Appellants,

v.

OCCIDENTAL PERMIAN LTD., Oxy USA, Inc., and Occidental Petroleum Corporation, Appellees.

No. 08–03–00407–CV.

Court of Appeals of Texas, El Paso.

June 30, 2005.

---

Craig T. Enoch, Winstead Sechrest & Minick P.C., Austin, for Appellants.

Deborah G. Hankinson, Law Offices of Deborah Hankinson PC, Dallas, for Appellees.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

### OPINION

DAVID WELLINGTON CHEW, Justice.

This is yet another oil and gas case originating from the attempted removal of an operator under an operating agreement. But it is of historic note as it may be the last oil and gas case from the Permian Basin that will reach this Court—certainly, the last one from Midland County[1]. The Appellants Fasken Land and Minerals, Ltd., Crane Avenue, Inc., and D.H. Acquisition, Ltd. (collectively "Fasken entities") appeal from a take-nothing judgment rendered in favor of Appellees Occidental Permian Ltd. ("OPL"), OXY USA, Inc., and Occidental Petroleum Corporation ("OPC").[2] Appellants sued Appellees for *inter alia* alleged

---

1. *See* TEX.GOV'T CODE ANN. § 22.201(i) & (*l*)(Vernon 2004); *see also* Acts of 2003, 78th Leg., R.S., ch. 315, § 4, 2003 TEX.GEN.LAWS 1337; Acts of 2003, 78th Leg., R.S., ch. 662, § 1, 2003 TEX.GEN.LAWS 2081.

2. OPL and OXY USA, Inc. are both subsidiaries of OPC.

breaches of an oil and gas unit operating agreement, concerning the provisions related to operator removal and election of a successor, and Fasken entities' preferential purchase right.[3] Fasken entities also sought a declaratory judgment on their preferential purchase right and OPL's removal as Unit Operator and its successor's election under the Unit Operating Agreement.[4] On appeal, Fasken entities bring four issues, in which they assert the trial court erred: (1) by refusing to award them administrative overhead charges paid to OPL; (2) by failing to render judgment that D.H. Acquisition, Ltd. is the successor Unit Operator; (3) by failing to declare the preferential purchase right notice invalid or alternatively erred by improperly instructing the jury; and (4) by impermissibly taxing certain items as costs. We affirm.

Fasken entities and OPL are working interest owners of the Midland Farms Unit ("MFU"), an oil and gas unit located on C Ranch in Andrews County, Texas. In 1913, David Fasken bought the C Ranch, which then consisted of 250,000 acres northwest of Midland. In the 1940s, Fasken family members leased out a portion of the property to Stanolind Oil Company. The Faskens retained a royalty interest in three-quarters of the property under the lease and held a working interest in one-quarter of the property. In the early 1960s, the property was unitized and divided into tracts for purposes of initiating secondary recovery operations. As a result, Pan American Oil Company ("Pan American"), formerly Stanolind, held ap-proximately 75 percent of the working interest over the entire acreage covered by the unit. In 1961, the working interest owners and royalty owners executed a Unit Agreement and a Unit Operating Agreement. The Unit Agreement was incorporated into the Unit Operating Agreement by reference and Pan American was designated as the initial Unit Operator. Pan American, which later became American Oil Company ("AMOCO") operated the Unit for several decades.

In 1995, Fasken entities initiated an audit of the MFU, and thereafter claimed a number of exceptions to its joint interest billing charges as a working interest owner of the Unit. Fasken entities later filed suit against AMOCO over the accounting issues and its operational practices and also attempted to remove it as operator. As part of the settlement of that lawsuit, the Unit Operating Agreement was amended to include a preferential right to purchase provision, contained in Article 24. In settlement negotiations, Fasken entities also agreed to the transfer of AMOCO's 75 percent working interest in the MFU to Altura Energy Ltd. ("Altura"), a limited partnership formed between AMOCO and Shell Oil Company in 1997 to operate their Permian basin assets as a single entity.

The present lawsuit arises from the purchase of Altura's working interest in the MFU by OPC through one of its subsidiaries in April 2000. In 1999, OPC, a Los Angeles-based oil and gas company, learned that AMOCO and Shell were considering selling the Altura properties. OPC expressed its interest in the assets

---

3. Fasken entities withdrew their claims for negligent misrepresentation, fraud, and civil conspiracy before the case was submitted to the jury. The trial court granted a directed verdict against Fasken entities on all the remaining claims against OPC and OXY USA, Inc., including their tortious interference claim.

4. Prior to the trial proceedings, the trial court granted part of Fasken entities' motion for partial summary judgment, finding that OPL was removed as the Unit Operator as of June 16, 2000.

and later received a formal letter inviting it to be part of the bidding process for the Altura acquisition. According to the letter, Altura was focusing its effort on companies that had expressed an interest in acquiring Altura in its entirety.[5] As a result of a multi-step bidding process, OPC was selected as the potential purchaser and if offered to purchase 100 percent of the Altura assets for approximately $3,550,000,000. The total purchase price included a small amount of assumed liabilities which added another $50 million to the transaction. AMOCO and Shell accepted the offer and the parties began negotiating the terms of the purchase and sale agreement.

During the due diligence process, OPC personnel and AMOCO representatives discussed whether the transaction triggered the provision for preferential right to purchase the MFU asset. OPC did not believe that the provision would be triggered by the transaction, but AMOCO felt strongly that it should offer the MFU as a preferential right. The MFU was the only Altura partnership interest that was subject to a preferential right.

Jim Lyerly, Senior Vice President in Financial Planning Analysis for Occidental Oil and Gas Company, an OPC subsidiary was part of the acquisitions team. Mr. Lyerly volunteered to work on the allocation of the purchase price for the MFU. In his testimony, Mr. Lyerly explained how he arrived at the later disputed $63 million figure as the allocation of the purchase price for the MFU. Since OPC was the buyer, they were asked to determine the allocated price of MFU, rather than have the seller make the determination outright, because they would know what they were paying for it. Mr. Lyerly knew the purchase price for the Altura properties was $3.8 billion in terms of total asset value and $3.6 billion in terms of the dollar amount. In undertaking to determine the allocated price for the MFU component, Mr. Lyerly first asked Terry Lindquist and Ed Behm, engineers experienced at building development and exploitation programs, to build a technical case for the value of the property, that is, an analysis of the projects based on technical matters in engineering and geology. Mr. Lyerly explained that the value of the property is centered on future capital, including the capability of reserves projects beyond the proved developed resources.

Before receiving the engineers' independent opinion, Mr. Lyerly conducted his own analysis, relying primarily on the Netherland Sewell reserve report, which evaluated all the Altura properties in the acquisition.[6] The Netherland Sewell report provided data on the properties in

**5.** Lon Buehner, an AMOCO executive in its acquisition and divestments group, explained that the company had considered breaking up the assets into smaller packages, but given their time frame for the sale, they ultimately decided to sell the entire entity as one package and considered it a unique opportunity for a party to make a major acquisition as a strong strategic move into a new core area of oil production. The company considered half a dozen bids, selected Netherland Sewell and Associates as the third-party engineering firm to value the properties, and provided bidders a significant amount of information that had previously been developed within Altura as well as extensive access to Altura staff.

**6.** Steven Chazen, chief financial officer for OPC, testified that Netherland Sewell and Associates is a well-known and reputable firm and one of the top three firms in the country that prepares these reserve reports. Mr. Chazen also testified that in the confidentiality agreement OPC executed as a bidder AMOCO and Shell disclaimed the Netherland Sewell report as a summary report, which it should not rely on necessarily. He explained that in the oil business, buyers are suppose to conduct their own evaluation and assume the risk in reserve production.

aggregate form—on more than 8,000 wells, of which the MFU interest was just a component. Mr. Lyerly knew the general background assumptions underlying all the evaluations in the report. In his evaluation, he adjusted for differences in their global assumptions and their discount rate for instance. Mr. Lyerly cut the MFU's probable reserves numbers in half in his assessment, but made no adjustment to the proved developed reserve numbers or the proved developed nonproducing reserve numbers. In Mr. Lyerly's opinion, the MFU had significantly more potential on average than all the other properties. He believed that a lot of oil had not been developed yet, thus, this particular property had a "disproportionate amount of upside." Mr. Lyerly then met with Mr. Lindquist and Mr. Behm and in their view there was tremendous potential in these properties. According to Mr. Lyerly, their evaluation was higher than his $63 million figure. He asked if they could support the $63 million figure and their answer was yes because their valuation actually supported a much higher number.

Concurrently with the OPC allocation process, Lon Buehner, an executive of AMOCO, had discussions internally with Stanley Davidson ("David") Grubb, Jr., the director of the acquisitions and divestments group, about the allocated value of the MFU in the Altura acquisition. There had been no agreement on the purchase price for Altura when Mr. Buehner first talked to Mr. Grubb and asked him to prepare a valuation of the MFU. Mr.

Grubb tabulated information on the MFU, relying mostly on the numbers in the Netherland Sewell report. Mr. Grubb stated that no risking was done in the Netherland Sewell report. He prepared a table of information which he gave to Mr. Buehner. Mr. Grubb did not know the purchase price and never did any other work related to allocating a portion of the purchase price to MFU. Mr. Grubb explained that the "sell" side never does the allocation. Rather, the seller looks at the allocation done by the buyer for a reasonableness check. Mr. Grubb knew that the information he provided to Mr. Buehner was for the purpose of checking that the allocated value was reasonable and within the bounds of petroleum engineering practices.

Mr. Buehner had a conversation with Mr. Grubb about his tabulated information on the MFU. They discussed the range of values for the MFU to be as low as $40 million and as high as $110 million, depending on the risk weighting put on the information.[7] Mr. Buehner then had a conversation with Mr. Lyerly about a range of numbers, but Mr. Lyerly indicated that he strongly believed that OPC had a technical justification for the $63 million figure. Following that discussion, Mr. Buehner spoke with Mr. Grubb again and informed him that the OPC value was in the $63 million range. According to Mr. Buehner, he and Mr. Grubb believed that there was a wide range with regard to the potential value of the MFU because of oil

7. Mr. Grubb testified that in his opinion, the Altura assets, a combination of AMOCO and Shell properties, were some of the highest quality reservoirs that existed in the Permian basin and by forming Altura, they had created the number one producer of oil in the Permian basin. Mr. Grubb believed the Netherland Sewell report numbers for probable reserves indicated that the projects that Altura would have ultimately done were technically and economically viable. In his MFU tabulation, he placed zero present value in the possible reserves category for the MFU because he was trying to be conservative. He believed that $52 million was the very lowest, most conservative valuation one could put on the MFU, noting that a $52 million figure would give no value to the possible reserves category and was an absurdly low value for probable reserves.

price sensitivity and based on how one would risk weight the upside of the MFU. They concluded that it was feasible for OPC to have a technical case that would support a value of $63 million. Mr. Grubb testified that the $63 million figure looked reasonable to him and that he never took into account the total purchase price for Altura in his determination.

Shortly before the purchase and sale agreement was executed, Mr. Buehner had a second meeting with Mr. Lyerly. Mr. Buehner mentioned to him that the higher end of his previous range of $60 million was very feasible and Mr. Lyerly reiterated that OPC felt they had a strong technical case that supported the $63 million figure. At that meeting, they determined that $63 million was the figure to be inserted in the purchase and sale agreement as the allocation of the purchase price for the MFU. Mr. Buehner also testified that the AMOCO legal department asked if $63 million was the appropriate value to be allocated to the MFU from the purchase price and he told them he believed it was. The parties ultimately executed the purchase and sale agreement, which listed the $63 million figure as the allocation of the purchase price attributable to the MFU in Article 3.2(b) of the purchase and sale agreement.[8]

On March 22, 2000, Altura sent a letter to each of the Fasken entities, notifying them that Altura had executed a purchase and sale agreement to sell a portion of their partnership interests to OPC. The letter stated that pursuant to Article 24 of the Unit Operating Agreement, the nonoperating working interest owners in the MFU may have a preferential right to purchase Altura's interest in the MFU.[9] The letter notified Fasken entities that the allocated value for the MFU was $63 million, payable in cash at or before the closing date, which was scheduled to occur by April 30, 2000. A copy of the purchase and sale agreement was attached, but did not include the exhibits. In the letter, Altura requested that Fasken entities respond to the notice within fifteen days after its receipt if they intended to exercise the preferential right to purchase the MFU. Altura also requested that a copy of the letter be returned to it, with a mark placed in the space provided as evidence of Fasken entities' election to purchase or not to purchase the MFU.

Fasken entities received the Altura letter on March 27, 2000. Norbert Dickman, general manager of the Fasken company, Sally Kvasnicka, the land manager, Mark Merritt, the engineering manager, and general counsel met and briefly discussed the letter. They scanned through the purchase and sale agreement and found the section that referred to the preferential purchase right for the MFU and provided that the allocated purchase price was $63 million.

8. Article 3.2(b) of the Purchase and Sale Agreement provides:

The Parties acknowledge that the sale of the Interests pursuant to this Agreement may trigger a preferential purchase right to that certain oil and gas estate (the 'Estate') covered by that certain Unit Operating Agreement (as amended, the 'Unit Operating Agreement'), in favor of Fasken Land and Minerals, Ltd. and certain other Persons (the 'Pref Rights Holders') covering the Midland Farms Unit. Sellers will cause the LP [Altura] to comply with the preferential purchase right procedures required by the Unit Operating Agreement; and the Parties agree that the allocation of that portion of the Purchase Price attributable to the Pref Rights Holders' interest in the Estate is Sixty–Three Million Dollars ($63,-000,000).

9. Altura held a 74.67 percent working interest in the MFU, which OPC or a subsidiary would acquire in the proposed sale.

On April 5, 2000, the Fasken entities sent a letter to Altura requesting more information about the proposed sale. In their letter, Fasken entities stated that it was their position that the proposed sale triggered Article 24 of the Unit Operating Agreement and that under the terms of that agreement, they had a right to "sufficient information to enable them to make an informed decision with respect to whether or nor to exercise their rights to acquire the Interest." Fasken entities asserted that the March 22, 2000 letter failed to satisfy the specific notice requirements of Article 24. Specifically, Fasken entities complained that the document they received was incomplete in that it was missing the referenced exhibits, which they stated were essential to their informed decision. Fasken entities also complained that neither the March 22 letter nor the attached documents provided any basis for the $63 million allocation price or for Altura's assertion that payment in cash at closing was a term or condition of the proposed sale to which they must agree in order to acquire the MFU. Fasken entities requested that Altura provide them with "all documents and other information necessary to verify the basis for the $63,000,000 allocation, the interest to which the allocation pertains, and provide an explanation for your assertion that the allocated purchase price is payable in cash at or before the Closing of the Proposed Sale." In closing, Fasken entities stated that until they had received all of the information Altura was required to provide under Article 24, "we will not consider the fifteen (15) day notice period to have commenced."

Fasken Engineering Manager Mark Merritt testified that after being presented with the $63 million figure, he began to run the economics on the MFU, which included looking at the current oil and gas price outlooks and operating expense forecasts, in order to determine whether $63 million was a reasonable number. Mr. Merritt made some adjustments to his calculations because he felt that Fasken could operate the property more cheaply, but could not come up with that high a value. The only way he could value the MFU at $63 million was to assume oil prices which at that time seemed outrageously high. Mr. Merritt's analysis of the MFU placed its value in the range of $35–$43 million.[10]

On April 10, 2000, Fasken entities requested a meeting of the working interest owners in the MFU for the purpose of removing the unit operator, Altura, and to elect a successor operator. In explaining this decision, Mr. Merritt stated that they were concerned about the continual change of personnel in the operation and felt they could operate the MFU more effectively and more efficiently. At the time, the Fasken company had its affiliate D.H. Acquisitions in mind as the successor operator.

On April 25, 2000, Occidental Permian Ltd. ("OPL"), formerly called Altura Energy Ltd., sent a letter to the MFU non-operating working interest owners of the

---

10. Mr. Dickman testified that Mr. Merritt reported to him that he thought the top value range for the MFU was 42 to 43 million dollars. Based on Mr. Merritt's recommendation from the information they had at that time, Mr. Dickman stated that this was the most he would have paid for the MFU. Ronald Harrell, a consulting petroleum engineer employed by Ryder Scott Company, testified that his company estimated that the fair market value of the Altura working interest in the MFU, as of January 1, 2000, was $34,500,000. However, without having had the opportunity to evaluate each of the properties that comprised the total asset purchase, Mr. Harrell was unable to do an allocation of the purchase price for the MFU with respect to the total transaction.

MFU.[11] In the letter, OPL disagreed with Fasken entities' objections to the March 22 notice letter, but wrote "[r]ecognizing that Fasken asked some legitimate questions (although beyond the requirements of Article 24), we are providing each of you with certain additional information that Fasken requested." OPL also wrote that "out of a spirit of cooperation and in light of your request for more information" it was extending another fifteen day deadline to the working interest owners to exercise its preferential right to purchase its interest in the MFU for $63 million. OPL enclosed a copy of the exhibits to the purchase and sale agreement, but stated that the exhibits "address the structure of the OPL's partnership and the sale of interests in OPL, not the conveyance of the Affected Interest or any particular real property." In response to Fasken entities' request for the basis of the allocation of 63 million dollars to the MFU, OPL stated that Article 24 did not require an explanation of the allocation in the event of a sale, "[h]owever, OPL in good faith considers sixty-three million dollars to be a reasonable allocation of the consideration to the Affected Interest." [12] OPL also explained that it had requested a cash payment because the sellers were receiving cash in consideration for the sale of their equity.

Fasken entities received the second notice letter on April 27. In Mr. Merritt's opinion, Fasken's primary issue was the allocation of the purchase price and the opportunity it presented to increase the value of the MFU in order to defeat their preferential purchase right. Mr. Merritt did not believe the $63 million figure was

inconceivable, but he wanted to see what the basis was for that figure and believed that Article 24 indicated that they were entitled to full information, including information on the allocation of the purchase price. Mr. Dickman also testified that the primary concern was the issue of sufficient information, that is, the basis for the $63 million allocation. Mr. Dickman also did not believe he could rely on OPL's good faith assertion of the allocation because of his fiduciary duties and because of Mr. Merritt's advice that the figure was far off.

On May 4, 2000, OPL and Fasken entities held a meeting at the Fasken company offices to discuss the concerns raised by Fasken entities. According to Mr. Dickman, OPL did not provide further information about how it determined the $63 million figure. On May 12, 2000, Mr. Dickman, as the Fasken entities agent, sent a letter to OPL, informing the company that it had not fully satisfied the notice requirements under Article 24 because the "full information" term in Article 24 required an explanation for the basis for the $63 million allocation to Altura's interest in the MFU, which had not been done. In the letter, Mr. Dickman stated that:

> It will be Altura's burden to establish the reasonableness of that allocation, your refusal to provide even an explanation of the purported allocation does not satisfy your obligation to provide 'full information' concerning a material element of the PSA. As such, your attempted notice remains ineffective to impose any deadlines for the exercise of the Fasken Entities' rights under Article 24.

---

11. On April 19, 2000, OPC closed on its purchase of the partnership interests in Altura and changed the partnership's name to OPL.

12. Mr. Oenbring testified that he believed that Fasken entities were given all the information they were entitled to and that in his experi-

ence with preferential rights provisions, the parties do not share engineering information because the working interest owners "have the intimate knowledge of the property already" as well as a history of the property's production information.

Mr. Dickman also asserted that the Fasken entities wished to exercise their rights to purchase the MFU interest, but had been denied that opportunity and considered OPL to be in material breach of the Unit Operating Agreement. Mr. Dickman requested a stated basis for the allocation and full information "concerning how that allocation was made and why it was considered to be reasonable." On behalf of the Fasken entities, Mr. Dickman also proposed an offer to purchase the MFU interest for $38,000,000 before June 1, 2000, "in an effort to resolve this matter without the need for protracted and expensive litigation...." [13] On June 9, 2000, the Fasken entities filed their original petition in this lawsuit.

On June 16, 2000, the MFU working interest owners met in Fasken's offices in Midland. At the time of the meeting, OPL owned almost 75 percent of the working interest, the Fasken entities collectively owned less than 24 percent, and Lowe Partners LP ("Lowe Partners") and Valence Operating Company ("Valence") each owned less than 1 percent. Mr. Behm acted as chairman and was the representative for OPL. The first item on the agenda was a vote to remove OPL as the operator. OPL voted its 74.67 percent interest against removal. The Fasken entities, Lowe Partners and Valence voted their combined 25.32 percent interest in favor of OPL's removal as operator. [14]

The next item considered at the meeting was the nomination of a successor operator of the MFU. Mr. Dickman nominated D.H. Acquisition and the Fasken entities, Lowe Partners, and Valence voted their combined interest in favor of D.H. Acquisition as the successor operator. OPL voted its 74.67 percent interest against the nomination. The meeting minutes show that Mr. Behm stated that the item failed and the ballot sheet reflects that the vote did not carry. After the voting, Mr. Dickman stated that OPL had been removed as operator and D.H. Acquisition had been properly elected and demanded that operations be transferred to D.H. Acquisition. Mr. Behm responded that OPL would continue to operate the MFU in good faith until a successor operator had been properly elected. [15]

Mr. Oenbring testified that he received a letter from Ms. Kvasnicka, on behalf of D.H. Acquisition, requesting that OPL turn over operations of the MFU to D.H. Acquisition. Mr. Oenbring replied to the letter, stating that D.H. Acquisition did not receive sufficient votes to be selected as successor operator and that OPL would continue to operate the MFU until there

13. Mr. Oenbring testified that he responded to Mr. Dickman's letter on June 1. In his response, Mr. Oenbring represented to Fasken entities that OPL would consider amending the preferential right provision in the event of any subsequent sale or assignment of its assets to non-Oxy affiliates and also indicated that OPL would provide the MFU portion of the Netherland Sewell report subject to a satisfactory confidentiality agreement. On June 2, Mr. Dickman replied, noting OPL's rejection of their proposal and requesting the entire Netherland Sewell engineering report.

14. It is undisputed that the vote to remove OPL as the operator passed pursuant to Article 6.2 of the Unit Operating Agreement, which provides that the Unit Operator may be removed "by the affirmative vote of at least eighty-five per cent (85%) of the voting interest remaining after excluding the voting interest of [the] Unit Operator."

15. Interestingly, Ms. Kvasknicka had sent an e-mail to Mr. Merritt on April 17, 2000, in reference to the meeting to remove the operator, indicating that she had spoken to Altura and was told "Oxy doesn't believe that Fasken can discharge Altura as the operator" and that "Oxy believes this will end up in court because the agreement doesn't have a clear mechanism to name the successor and that the vote will end in a stalemate."

was a duly elected successor operator.[16] Fasken later amended its original petition in the lawsuit to include breach of contract claims for OPL's refusal to accede to its removal as Unit Operator, its refusal to acknowledge D.H. Acquisition's election as its successor, and its refusal to turn over MFU operations to D.H. Acquisition. Fasken also requested a declaratory judgment stating that OPL was removed as Unit Operator of the MFU and that D.H. Acquisition was duly elected as the successor Unit Operator.

Prior to the jury trial, Fasken moved for partial summary judgment on the issues of whether OPL was removed as Unit Operator of the MFU and whether D.H. Acquisition was duly elected as its successor. The trial court granted summary judgment on the removal issue, concluding that OPL was removed as Unit Operator of the MFU on June 16, 2000, however, the trial court denied Fasken's motion in all other respects. The trial court submitted five questions to the jury. The first two questions concerned the alleged breach of Article 24.1 (the preferential right provision). The remaining questions concerned Fasken entities' alleged damages for OPL continuing to act as Unit Operator after June 16, 2000 and their reasonable attorney's fees related to the breach of contract claim. The jury answered all questions in favor of OPL. Fasken entities filed a motion for judgment notwithstanding the verdict, in which they argued *inter alia* that the evidence established as a matter of law: (1) that OPL had failed to comply with the notice provisions of Article 24.1; (2) that Fasken was entitled to recover on the claim for administrative overhead paid to OPL after June 30, 2000; and (3) that D.H. Acquisition had been elected successor Operator. The trial court denied Fasken entities' motion and rendered judgment on the jury's verdict that the Fasken entities take nothing from the defendants.

We begin our discussion with Issue Three where Fasken entities complain that the trial court erred in failing to declare OPL's notice invalid because there was no evidence that OPL provided "full information," as required under Article 24.1, which they argue meant information about how the allocation of value for the MFU was calculated, in addition to the four items specifically listed in the Unit Operating Agreement. We understand Fasken entities' argument to be that the trial court erred in construing Article 24.1 and under a correct interpretation of that provision, the evidence at trial established as a matter of law that OPL failed to comply with Article 24.1.

The parties' dispute entails the interpretation of the Unit Operating Agreement. On appeal there is no dispute among the parties that their agreement was an unambiguous contract. Construing an unambiguous contract involves a question of law, which we review *de novo*. *MCI Telecommunications Corporation v. Texas Utilities Electric Company*, 995 S.W.2d 647, 650–51 (Tex.1999); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). In construing an unambiguous contract, a court should attempt to harmonize and give effect to all provisions so that none is rendered meaningless. *MCI Telecommunications Corp.*, 995 S.W.2d at 650–51; *Coker*, 650 S.W.2d at 393. We give terms their plain, ordinary, and generally accepted meaning unless the instrument requires otherwise. *Sun Operating, Ltd. v. Holt*, 984 S.W.2d 277, 285 (Tex.App.-Amarillo 1998, pet. de-

---

**16.** Mr. Oenbring testified that under OPL's operation, the MFU has improved production and the Fasken entities have received about $25 million in net profits through their royalty interest and working interest in the MFU.

nied). The primary concern of a court when construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *National Union Fire Insurance Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995). When the parties disagree over the meaning of an unambiguous contract, we must determine the parties' intent from the agreement itself, not from the parties' present interpretation. *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 139 (Tex.App.-El Paso 1997, pet. denied). Further, we will not rewrite contracts to insert provisions parties could have included or imply restraints for which they have not bargained. *Tenneco Inc. v. Enterprise Products Co.*, 925 S.W.2d 640, 646 (Tex. 1996).

 A preferential right is a preemptive right, which requires a property owner to first offer the property to the right holder at the stipulated price and terms in the event the owner decides to sell the property. *Riley v. Campeau Homes (Texas), Inc.*, 808 S.W.2d 184, 187 (Tex.App.-Houston [14th Dist.] 1991, writ dism'd by agr.); *Holland v. Fleming*, 728 S.W.2d 820, 822 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.). Until the right is triggered, its holder may not compel the property owner to sell. *Riley*, 808 S.W.2d at 187. However, once an owner decides to sell, the owner is obligated to offer the right holder the opportunity to buy the property on the terms offered by a bona fide purchaser. *Id.* at 187; *Holland*, 728 S.W.2d at 823.

 Article 24.1 of the Unit Operating Agreement provides working interest owners with a preferential right to purchase an affected interest in the MFU in the event of a sale or transfer of that interest. Specifically, Article 24.1 provides in part:

> *Preferential Right to Purchase.* Should any party hereto desire to sell or otherwise assign, transfer or dispose of its interest in the oil and gas estate under this agreement or in the Unit Area, or should any party hereto desire to sell, assign or otherwise transfer ownership or control of ownership of the business entity that is a party or a successor to a party to this Agreement, such party shall promptly give written notice to the other parties, with full information concerning its proposed sale, assignment, transfer of ownership or transfer of control of ownership; or other disposition, which notice shall include: (1) the name and address of the prospective purchaser, assignee, or transferee (who must be ready, willing and able to purchase or accept the transfer); (2) the purchase price or in the event of the transfer of a business entity or group of properties, an allocation of that portion of the purchase price attributable to its interest in the oil and gas estate under this Agreement or in the Unit Area; (3) a legal description sufficient to identify the property and interest; and (4) all other terms of the proposed sale, or transfer of control or ownership. The other parties shall then have an optional preferential or preemptive right, for a period of fifteen (15) days after the notice is received to purchase the interest in the oil and gas estate under this Agreement or in the Unit Area offered, or subject of the sale or the transfer, for the stated consideration and on the same terms and conditions. If this optional right is exercised by more than one of the other parties, the purchasing parties shall share ownership of the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties.

Under Fasken entities' asserted interpretation of Article 24.1, they were "entitled to full information concerning the pro-

posed sale, assignment, transfer of ownership or transfer of control of ownership, or other disposition of the interest in the Midland Farms Unit, *including* the four categories of information expressed in the Unit Operating Agreement." [Emphasis added]. Fasken entities argue that the plain meaning of the language in Article 24.1 required OPL to provide "full information," which included how the allocation of the purchase price attributable to the MFU was calculated, in order to activate the time for them to exercise their preferential purchase right. We cannot agree with Fasken entities' position, however, because doing so would certainly defeat the purpose of the written notice provision and further, such an interpretation fails to give effect to the parties' intention as expressed in the agreement itself. The clear purpose of Article 24.1 is to provide prompt written notice of any proposed sale, assignment, transfer of ownership or transfer of control of ownership of an affected interest. Article 24.1 enumerates four specific items which "shall" be included in said written notice, that is, "(1) the name and address of the prospective purchaser, assignee, or transferee (who must be ready, willing and able to purchase or accept the transfer); (2) the purchase price or in the event of the transfer of a business entity or group of properties, an allocation of that portion of the purchase price attributable to its interest in the oil and gas estate under this Agreement or in the Unit Area; (3) a legal description sufficient to identify the property and interest; and (4) all other terms of the proposed sale, or transfer of control or ownership." By the specified items contained in the provision, the parties prescribed what would constitute full information concerning the proposed transaction and by doing so, clearly limited the purpose of giving written notice to information considered material to the right holders' ability to

exercise the preferential right on the same terms and conditions as the bona fide purchaser.

While is it undisputed that OPL provided no information to Fasken concerning the basis for the $63 million allocation of the purchase price attributable to the MFU, no such information was required by Article 24.1 for purposes of providing written notice of the proposed transaction. Therefore, the trial court did not err in failing to declare the notice was invalid on this ground.

■■■ Alternatively, Fasken entities argue that the trial court improperly instructed the jury that "full information" meant only the four enumerated items in Article 24.1 and this error probably caused the rendition of an improper judgment. Fasken entities also argue that the jury should have been permitted to consider whether full information was provided, in addition to the four categories of information expressed in the Unit Operating Agreement. The trial court has broad discretion in submitting instructions to the jury and its determinations will not be disturbed absent an abuse of discretion. *See Trinity Indus., Inc. v. Ashland, Inc.,* 53 S.W.3d 852, 859 (Tex.App.-Austin 2001, pet. denied).

The following questions were submitted to the jury: (1)(A) "Did Occidental Permian Ltd., (formerly known as Altura Energy, Ltd.) fail to comply with the notice provisions of Article 24.1?"; and (1)(B) "Did Occidental Permian, Ltd. fail to comply with Article 24.1 by providing $63 million as an allocation of that portion of the purchase price attributable to Altura Energy, Ltd.'s interest in the oil and gas estate under the Midland Farms Unit?" Over Fasken entities' objections, the jury was instructed that "written notice" under Article 24.1 meant those items specifically

listed in categories (1)-(4) contained in Article 24.1 and no other. The jury answered "No" to both questions.

First, we observe that the jury instruction does not instruct the jury that "full information" meant those items specifically listed in categories (1)-(4) contained in Article 24.1, but rather the jury was instructed that "written notice" under Article 24.1 meant those items specifically listed in the four enumerated categories. However, as discussed above, Article 24.1 designated that, for purposes of providing written notice to the other MFU interest owners, "full information" meant the items listed in categories (1)-(4). Fasken entities assert that the jury instruction did not permit the jury to consider other information, in addition to the four categories of information, in determining whether OPL complied with Article 24.1, and therefore was error. We conclude that the trial court properly interpreted the Article 24.1 provision, which expressed the parties' intent to designate which items of information must be included in any written notice of the triggering of the preferential right. The trial court's instruction, therefore, was not erroneous because it tracked the contract language regarding what "full information" was to be provided in the written notice. *See Lively Exploration Co. v. Valero Transmission Co.,* 751 S.W.2d 649, 654–55 (Tex.App.-San Antonio 1988, writ denied).

Even assuming *arguendo* that the trial court erred in its instruction, Fasken entities have failed to show that the error probably caused the rendition of an improper judgment. To determine whether error in the charge is reversible, we must consider the pleadings of the parties, the evidence presented, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). Error in the charge is reversible if, in light of the entire record, it was reasonably calculated to and probably did cause the rendition of the improper judgment. *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995).

Fasken entities argue that there was evidence in the record from which the jury could have inferred the $63 million allocation was not the result of a good faith effort to determine a reasonable allocation of the purchase price, but rather was an attempt to inflate the price of the MFU to defeat Fasken entities' ability to exercise its preferential purchase right. First, we observe that Fasken entities have not challenged the jury's failure to find that OPL did not comply with Article 24.1 by providing $63 million as the allocation of that portion of the purchase price attributable to Altura's interest in the MFU. Second, even if the jury had considered the OPL's failure to provide the basis for the $63 million, there was undisputed evidence that Fasken entities received the four enumerated categories of information in OPL's Article 24.1 written notice. The notice requirement was merely incidental to the preemptive right afforded to other interest owners in the MFU. *See Mecom v. Gallagher,* 213 S.W.2d 304, 312 (Tex.Civ. App.-El Paso 1947, no writ). The notice given was sufficient to reasonably disclose the proposed transaction and to provide Fasken entities an opportunity to exercise its preferential right to purchase the MFU interest on the same terms and conditions as the bona fide purchaser—even if there were technical deficiencies that rendered that notice less than perfect. *See id.* at 306–07, 310–11 (refusing to indulge in pure technicalities where notice was sufficiently performed and right holder was given opportunity to exercise his option, but declined to do so). Thus, in light of the entire record, we cannot conclude that the trial court's instruction, if erroneous, prob-

ably caused the rendition of an improper judgment. Issue Three is overruled.

 Fasken entities contend in Issue Two that the trial court erred in failing to render judgment that D.H. Acquisition was elected successor Unit Operator. Specifically, Fasken entities assert that Article 6.3, the successor selection provision in the Unit Operating Agreement, is unambiguous and it should be construed as a matter of law that D.H. Acquisition was elected successor operator under Article 6.3. We first observe that it is undisputed that the Fasken entities and OPL are all working interest owners in the MFU and parties to the Unit Agreement and Unit Operating Agreement, which govern the development and operation of the MFU. It is also undisputed that in June 2000, the Fasken entities and other non-operator working interest owners, collectively having 25.32 percent of the working interest, voted to remove OPL as the operator and then voted their combined interests in favor of D.H. Acquisition as successor, while OPL voted its 74.67 percent interest against the nomination.[17]

We apply the well-settled principles of contract law discussed above in resolving Fasken entities' complaint. Under the Operating Agreement, selection of a successor Unit Operator is contingent on the resignation or removal of the current Unit Operator. Article 6.2 provides:

> 6.2 *Resignation or Removal.* Unit Operator may resign at any time. Working Interest Owners may remove Unit Operator by the affirmative vote of at least eight-five per cent (85%) of the voting interest remaining after excluding the voting interest of Unit Operator. A Unit Operator who resigns or is removed shall not be released from its obligations hereunder for a period of three (3) months after its resignation or discharge unless a successor Unit Operator shall have taken over the operations hereunder prior to the expiration of said period.

Thus, by its plain language Article 6.2 requires a super-majority vote of non-operating interest owners for the removal vote to carry. Article 6.2 does not prohibit the current Unit Operator from voting, but its voting interest is clearly excluded in tallying the affirmative vote for removal.

The selection of a successor Unit Operator in the event of a resignation or removal is governed by Article 6.3. Article 6.3 provides:

> 6.3 *Selection of Successor.* In the event of the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by the affirmative vote of three (3) or more Working Interest Owners having at least eighty-five per cent (85%) of the combined voting interest of all Working Interest Owners, provided no Unit Operator who is removed may vote to succeed itself.

First, Fasken entities assert that Article 6.3 requires that a successor "shall be selected" thus, it mandated the selection of a successor Unit Operator, in this case, D.H. Acquisition, the party nominated. However, Article 6.3 clearly states that any succession must be based upon the designated affirmative vote. Therefore, we find this argument has no merit.

Second, Fasken entities argue that by voting against D.H. Acquisition's nomination as successor Unit Operator, OPL has in effect voted to succeed itself, an action

---

17. OPL concedes that it was "removed" as Unit Operator by the affirmative vote of the non-operator working interest owners in the MFU. However, OPL maintains the position that its authority to act as the Unit Operator under the terms of the Operating Agreement must continue until it is "replaced" by a duly elected successor pursuant to Article 6.3.

which is prohibited under Article 6.3. We agree that the plain language of Article 6.3 prohibits the Unit Operator who is removed from voting for itself. This, however, has not occurred. The succession vote requires the affirmative vote of three or more working interest owners who have at least 85 percent of the combined voting interest of *all* working interest owners. Article 6.3 in no way prohibits the removed Unit Operator from casting its vote against the nominated successor. Clearly, the parties' intent was to ensure the super-majority of the working interest owners—who necessarily have a greater stake in the MFU's success—would determine which of the working interest owners should be duly elected as the successor Unit Operator. It so happens that since its inception, the Unit Operator of the MFU has been the initial Unit Operator (Pan American Petroleum Company, followed by its successors), which has over time maintained almost 75 percent of the combined voting interest. Despite having maintained an influential voting position, we observe that OPL, standing alone, nevertheless does not command a super-majority affirmative vote by virtue of its majority voting interest. Article 6.3 also requires an additional 10 percent of the voting interest, and in addition, at least two minority working interest owners must also be in accord.

Third, Fasken entities assert that the super-majority affirmative vote requirement only applies in the event that the removed Unit Operator does not vote to succeed itself. Under their interpretation, the phrase "provided no unit Operator who is removed may vote to succeed itself" is a condition precedent for "the affirmative vote of three (3) or more Working Interest

Owners having at least eighty-five per cent (85%) of the combined voting interest of all Working Interest Owners...." Even if we were to agree with the merits of this argument as we discussed above, OPL did not vote to succeed itself, but rather asserted its contractual right to vote against the working interest owner who was nominated as successor.[18]

▆▆▆▆ Finally, Fasken entities argue that OPL is estopped from enforcing the successor Unit Operator provisions and from asserting that D.H. Acquisition is not the duly elected successor Unit Operator because despite the terms of the Unit Operator Agreement, OPL voted "no," did not nominate or take steps to elect a successor, and has unilaterally insisted on a right to continue operating the MFU. In support of its argument, Fasken entities cite to this Court's opinion in *El Paso Nat'l Bank v. Southwest Numismatic Investment Group, Ltd.*, 548 S.W.2d 942, 948 (Tex.Civ.App.-El Paso 1977, no writ), in which we discussed the doctrine of quasi-estoppel. As we stated in *El Paso Nat'l Bank*, unlike equitable estoppel, quasi estoppel requires no showing of false representation or detrimental reliance. *Id.* at 947–48. The principle of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. *Id.* at 948. The doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit. *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex.App.-Houston [14th Dist.] 1991, no writ). Thus, the doctrine

---

18. Fasken entities assert in their brief that "OPL continues to vote 'no' in any successor Unit Operator elections" and by its action has eviscerated the parties' removal provision.

They have provided no citation to the record of evidence of other "no" votes by OPL nor have we found such evidence in our review of the record.

forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Mexico's Indust., Inc. v. Banco Mexico Somex, S.N.C.,* 858 S.W.2d 577, 581 n. 7 (Tex.App.-El Paso 1993, writ denied).

We understand Fasken entities to be arguing that OPL—by agreeing to Articles 6.2 and 6.3, namely, that: (1) the Unit Operator may be removed by a vote of at least eighty-five percent of the voting interest remaining after excluding the voting interest of the Unit Operator; (2) the Working Interest Owners shall select a successor Unit Operator; and (3) no removed Unit Operator may vote to succeed itself—accepted the benefit of the transaction or acquiesced to it. Further, Fasken entities argue that by voting "no" and refusing to participate in the election of a successor Unit Operator, OPL has effectively voted to succeed itself, which is a position inconsistent with the position OPL had previously taken.

Fasken entities' attempt to establish quasi-estoppel conclusively, however, fails for several reasons. First, they have wholly failed to show that the evidence conclusively establishes the elements of quasi-estoppel as a matter of law. Second, OPL's decision to vote against the nomination of D.H. Acquisition is not an act inconsistent with its previous position, which presumably, Fasken entities is arguing was OPL's decision to agree to the terms of Articles 6.2 and 6.3. We simply fail to see how agreeing to the parties' contract amounts to an inconsistent position with OPL's later assertion of its voting rights under that same contract such that the super-majority affirmative vote provision should no longer apply. Under Fasken entities' analysis, quasi-estoppel would lie in any breach of contract claim. This certainly cannot be the case since this equitable doctrine applies only where it would be "unconscionable" to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit. *Steubner Realty 19, Ltd.,* 817 S.W.2d at 164. In sum, we find Fasken entities' quasi-estoppel argument to be without merit.

After reviewing Fasken entities' numerous contentions, we conclude the trial court did not err by failing to render judgment that D.H. Acquisition was elected successor Unit Operator. Issue Two is overruled.

The Fasken entities contend in Issue One that they were entitled to judgment as a matter of law for the amount of administrative overhead collected by OPL after it had been removed as Unit Operator on June 16, 2000. Fasken entities claim that the trial court erred because OPL failed to prove its entitlement to those administrative overhead charges either under contract, quantum meruit, or unjust enrichment. They also assert that at all times it was OPL's burden to establish a contractual entitlement to collect the administrative overhead Fasken entities paid to OPL, which they argue OPL failed to do. To the contrary, Fasken entities maintain that they conclusively negated the existence of any contractual relationship with respect to the operation of the MFU by establishing OPL had been removed as Unit Operator on June 16, 2000.

We must disagree with Fasken entities' contention that OPL had the initial burden to plead and to prove it had the right to retain administrative overhead charges. Pointing to cases involving actions for declaratory judgment, Fasken entities assert that the trial court was to ignore the formal position of the parties and place the burden of proof on the party asserting the affirmative of the controlling issues-which in this case, was on OPL to

establish it was operating the MFU under a valid and enforceable contract. *See e.g., Ross v. American Radiator & Standard Sanitary Corp.,* 507 S.W.2d 806, 809–10 (Tex.Civ.App.-Dallas 1974, writ ref'd n.r.e.). The present case, however, is distinguishable by reason that the Fasken entities did not bring suit to establish their non-liability for administrative overhead charges due, but not paid. Rather, they sought to recover any damages that were a result of OPL continuing to operate the MFU in breach of the parties' contract, which could have included recouping administrative overhead charges they had paid. The burden of proof, therefore, was on Fasken entities to plead and prove its breach of contract claims.

■ We also note that Fasken entities did not specifically plead nor request submission of a specific question in support of any claim for recovery of the administrative overhead they paid to OPL. At trial, Fasken entities elicited testimony from Mr. Merritt concerning the overhead costs that the Fasken entities had paid to OPL through their joint interest billings from July 2000 to December 2002. Mr. Merritt stated that he believed Fasken was seeking to recover these overhead costs in this litigation. OPL objected to this line of testimony, arguing that the overhead issue was not supported by the pleadings and refusing to try the issue by implied consent. In response, Fasken entities argued that their general prayer for relief supported their attempt to recover the over-

head they paid after OPL was removed as the operator.[19] The trial court allowed testimony on the overhead issue after finding that Fasken entities had pled they were damaged to some degree by OPL's alleged improper operation of the MFU. Without waiving its objection, OPL requested and was granted leave to file a trial amendment to its pleadings to include defenses of waiver, unjust enrichment, quantum meruit, and estoppel.

While OPL did amend its answer to include certain defenses that could have barred Fasken entities' recovery of administrative overheard charges, but failed to request jury questions on these defense issues, this is of little import unless Fasken entities had proven that by continuing to operate the MFU after June 16, 2000, OPL was in breach of the Unit Operating Agreement and that they suffered damages resulting from that breach. However, we need not entertain the issue of whether Fasken entities conclusively established as a matter of law that OPL breached the Unit Operating Agreement by collecting the administrative overhead because they have not challenged the jury's failure to find that they were damaged by OPL continuing to act as Operator under the Unit Operating Agreement after June 16, 2000.[20] *See Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 758 (Tex.App.-El Paso 2000, no pet.)(elements of a breach of contract claim are the existence of a valid contract; performance or

---

**19.** In Fasken entities' fifth amended petition, they alleged that "Plaintiffs are entitled to recover from OPL all damages to which Plaintiffs are entitled at law or in equity due to Altura's and OPL's breaches of contract, including (but not by way of limitation) Plaintiffs' expenses and attorneys' fees incurred with respect to this case."

**20.** In Question No. 3, the jury was asked, "Were Plaintiffs damaged by Occidental Per-

mian, Ltd. continuing to act as Operator under the Unit Operating Agreement for the Midland Farms Unit after June 16, 2000?" The jury was instructed that "Occidental Permian, Ltd. was removed as Operator under the Unit Operating Agreement for the Midland Farms Unit on June 16, 2000, and no successor Operator was elected" The jury answered, "No" to Question No. 3.

tendered performance by the plaintiff; breach of the contract by the defendant; and damages to the plaintiff resulting from that breach). Therefore, we conclude the trial court did not err in refusing to award Fasken entities the administrative overhead collected by OPL after OPL was removed as Unit Operator. Issue One is overruled.

In Issue Four, Fasken entities contend that the trial court erred by taxing items as costs that are not permitted by any rule or statute. Specifically, they challenge the awarding of costs in the amount of $27,232.76 for deposition-related expenses for services other than "original stenographic transcripts." The assessment of costs will be reversed on appeal only if the trial court abused its discretion. *Crescendo Investments, Inc. v. Brice*, 61 S.W.3d 465, 480 (Tex.App.-San Antonio 2001, pet. denied); *Allen v. Crabtree*, 936 S.W.2d 6, 7–8 (Tex.App.-Texarkana 1996, no writ).

Rule 131 provides that "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX.R.CIV.P. 131. Section 31.007(b) of the Texas Civil Practice and Remedies Code states that a judge of any court may include in any order or judgment all costs, including "fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit" and "such other costs and fees as may be permitted by these rules and state statutes." *See* TEX. CIV.PRAC. & REM.CODE ANN. § 31.007(b)(2) & (4)(Vernon 1997). Texas courts have also allowed recovery of items such as deposition costs and filing, court report, transcript, and subpoena/citation fees. *See Brice*, 61 S.W.3d at 480; *Allen*, 936 S.W.2d at 8; *Wallace v. Briggs*, 162 Tex. 485, 348 S.W.2d 523, 527 (1961). Texas Rule of Civil Procedure 140, however, specifically

prohibits copies of paper not required by law or the rules from being taxed in the bill of costs. *See* TEX.R.CIV.P. 140.

After the trial court entered the final judgment against Fasken entities, a bill of costs was issued which taxed to Fasken entities the total deposition cost for all defendants in the amount of $9,199.19. Upon the defendant's motion to retax costs, the trial court later awarded deposition costs of $17,551.90 to OPC and $18,930.05 to OPL. Thus, the total deposition costs taxed to Fasken entities was $36,481.95.

In their brief, Fasken entities assert that the extra deposition-related expenses in the amount of $27,232.76 included charges for "video depositions, electronic versions of transcripts, condensed print versions of transcripts, photocopies, and extra copies of deposition transcripts," as reported in the defendants' verified statements of costs. However, they fail to direct our attention to specific items in the defendants' verified statements of costs which they assert constitute the $27,232.76 they claim was improperly taxed. Under Rule 38.1(h) of the Texas Rules of Appellate Procedure, an appellant's brief must contain a clear, concise argument for the contentions made, including appropriate citations to authorities and to the record. TEX.R.APP.P. 38.1(h). After reviewing the record, we cannot determine which itemized costs in defendants' verified statements of costs constitute the $27,232.76 that was purportedly improperly taxed.

Further, we observe that the defendants' verified statements of costs are supported by affidavits which state that the referenced depositions and transcripts were "necessarily obtained for use in the suit and were used to question witnesses and prepare for argument at trial. As the *Brice* Court noted, "[t]ranscripts 'necessarily obtained for use in the suit' seems to

obviously include depositions and trial testimony used to question witnesses and prepare for argument at trial." *Brice*, 61 S.W.3d at 480–81. Costs which are necessary to the conduct of trial may be recoverable. *Operation Rescue–Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 937 S.W.2d 60, 88 (Tex. App.-Houston [14th Dist.] 1996), *aff'd as modified on other grounds*, 975 S.W.2d 546 (Tex.1998). Accordingly, we cannot conclude the trial court abused its discretion in its assessment of costs. Issue Four is overruled.

We affirm the trial court's judgment.